BARNES, J.,
for the Court:
¶ 1. After an Illinois Central Railroad Company (Illinois Central) train struck and killed Sharon Young, a wrongful-death action was filed on behalf of Young’s two children, Tasandra and Shiron Young (collectively referred to as Appellees), against Illinois Central and the train’s locomotive engineer, Fred Herndon (collectively referred to as Appellants). A Holmes County Circuit Court jury found Illinois Central and Herndon negligent and awarded the Appellees $2,000,000 in compensatory damages, which was later reduced by the circuit court to $1,174,761. The Appellants appeal the judgment, and finding error, we reverse and remand the case for a new trial.
SUMMARY OF FACTS AND PROCEDURAL HISTORY
¶ 2. On November 28, 2005, at approximately 12:05 p.m., Young was struck and killed by a southbound Illinois Central train while walking beside railroad tracks near her home in Tchula, Mississippi. Young was walking home and had allegedly accessed the railroad tracks from a worn path in the vegetation along the track. When first spotted by the train’s engineer, Herndon, Young was several hundred feet ahead of the train, slowly walking about 10-12 feet from the west rail. When the train’s conductor, J.R. Marchisio III, spotted Young, she was walking down the east track with her head down and did not appear to be attentive to the approaching train. When Herndon re *996 alized Young might be in imminent danger of not clearing the track in time, he initiated the train’s emergency brakes; however, the train struck Young and continued its forward progress for approximately 2,500 feet. The train was traveling at approximately 43 miles per hour, below the posted speed limit of 60 miles per hour. At the point of impact, Young was walking beside the. east side of the rail, with her back to the train.
¶ 3. Young, who was twenty-four years old, suffered from schizophrenia. Between 2000 and 2004, she had been involuntarily committed ten times to the Mississippi State Hospital in Whitfield. Young’s mother, Sandra Young, again attempted to have Young committed in January 2005. Young was non-compliant with her medication and treatment for her schizophrenia and had a well-documented pattern of harmful and erratic behavior, such as drug use, and violent outbursts.
¶ 4. In October 2005, Young gave birth to her second child, Shiron. Sandra, who already had full custody of her granddaughter, Tasandra, obtained custody of Shiron as the hospital would not release the newborn into Young’s care. At the time of the accident, Young and her two children lived at Sandra’s home in Tchula. According to her family’s testimony, Young had been acting “fine” in the months leading up to her death. There was no evidence of drugs or alcohol in Young’s system at the time of her death.
¶ 5. A wrongful-death action was filed on behalf of the Appellees, alleging “negligence, gross negligence and willful and wanton conduct” by Illinois Central and Herndon, and requesting compensatory and punitive damages. Specifically, the Appellees contended that Herndon never blew the train’s horn to warn Young of the train’s approach and that Illinois Central knew that the tracks were routinely accessed by pedestrians and should have been aware of the danger of injury.
¶ 6. After a five-day trial in October 2009, the circuit court jury returned a verdict, assigning percentages of negligence as follows: (1) Young — 20%; (2) Herndon — 40%; and (3) Illinois Central— 40%. The jury awarded a general verdict of $2,000,000 in damages to the Appellees. The circuit court subsequently entered a judgment that amended the jury’s verdict to comply with Mississippi Code Annotated section 11-1-60 (Supp.2005), reducing the net award to the Appellees to $1,174,761.[1] This amount included economic damages of $5,116 for funeral expenses; $169,646 for loss of Social Security disability benefits; and noneconomic damages of $1,000,000.[2]
¶ 7. The Appellants filed a motion for a judgment notwithstanding the verdict (JNOV), or in the alternative, for a new trial, and a motion for remittitur. The circuit court denied the motions. The Appellants cite several assignments of error, and the Appellees have filed a cross-appeal, contesting the circuit court’s denial of their request to submit the issue of punitive damages to the jury. Finding that the jury’s apportionment of fault was against the overwhelming weight of the evidence, we reverse the judgment and remand this case for a new trial consistent with this opinion.
*997 DISCUSSION AND ANALYSIS
I. Whether the circuit court erred in denying the Appellants’ motion for a JNOV.
¶ 8. The denial of a motion for a JNOV is reviewed de novo. U.S. Auto. Ass’n (USSA) v. Lisanby, 47 So.3d 1172, 1176 (¶ 8) (Miss.2010) (citing U.S. Fid. & Guar. Co. of Miss. v. Martin, 998 So.2d 956, 964 (¶ 19) (Miss.2008)). “A motion for [a] JNOV is a challenge to the legal sufficiency of the evidence, and this Court will affirm the denial of a JNOV if there is substantial evidence to support the verdict.” Id. Evidence is considered “in the light most favorable to the appellee, giving that party the benefit of all favorable inferences that may be reasonably drawn from the evidence.” Id.
¶ 9. The Appellants claim that once Young, “a pedestrian trespasser or a licensee,” was discovered “on the tracks in a position of peril,” their duty was “to use ordinary care to refrain from injuring” her and to provide warning if time permitted. They cite Young v. Columbus & Greenville Railway, 165 Miss. 287, 294, 147 So. 342, 343 (1933), in which the Mississippi Supreme Court held:
[ I]f the engineer after becoming aware of the presence of the trespasser does nothing to warn him by sounding the whistle, and by taking such other reasonable action as would save the trespasser from death or serious injury, the railway company is liable as for a wanton or willful injury.
¶ 10. At trial, the Appellees submitted Jury Instruction P-3, which stated that if the railroad had knowledge of the public use of the paths near the tracks and had not taken action “to prevent or reduce the number of persons walking along and across the tracks,” then the jury may find that the Appellants owed Young “an audible warning of the train’s approach, and a duty to keep a proper lookout ahead for pedestrians on the traeks[.]” Regarding the propriety of the jury instruction, the Appellees cited Archie v. Illinois Central Gulf Railroad, 709 F.2d 287 (5th Cir.1983),[3] and contended that Illinois Central’s acquiescence in allowing persons to utilize the pathways across the tracks elevated its duty to reasonable care. The circuit judge allowed the instruction and amended the language to reflect that if the jury believed that Illinois Central knew of the public’s use and acquiesced to such use, then Illinois Central and Herndon owed Young a duty to exercise “reasonable care.”[4] The jury instruction stated that *998 this “acquiescence ... [did] not create a duty or impose on the railroad an obligation to provide safeguards against accident/incidents to such use[.]” The “duty to sound an audible warning” and keep a “proper lookout” remained in Jury Instruction P-3.
¶ 11. In this case, we find the argument regarding the type of duty owed by the Appellants to Young to be a distinction without a difference. The Appellees concede that the only basis for their negligence claim against Illinois Central and Herndon rests on whether or not Herndon blew the horn to warn Young of the approaching train. At oral argument before this Court, the attorney for the Appellees acknowledged that “if the horn did blow, we lose.”
¶ 12. The Appellants argue there was sufficient evidence that the train’s horn was blown and that Young was provided with adequate warning, and they submit that the circuit court erred in denying their JNOV, as “there is no basis upon which they may be held liable.” At trial, the train’s engineer, Herndon, testified that he blew the train’s horn to warn Young and blew it “practically almost till we stopped.” As the train came out of a curve north of where the accident occurred, Herndon was on the right (west) side of the train, and he spotted Young several hundred feet ahead, “attempting to cross the tracks.” Herndon testified that Young was approximately 10-12 feet from the west side of the rail and that “she was looking down.” As the train continued to advance, she moved towards the east side of the tracks and went out of Herndon’s line of sight. The train’s conductor, Mar-chisio, also testified that Herndon was blowing the horn coming out of the curve north of the impact site. Marchisio, who was located on the left side of the train opposite of Herndon, first observed Young on the east side of the track, “walking south.” He said Young walked straight down the track for approximately “25-30 feet.” Marchisio noted that Young’s head was down and that she never acknowledged the train’s presence. He yelled at her to “get out of the way,” but she did not.
¶ 13. Moreover, the train’s event recorder data showed that the horn and bell were activated before the accident. The majority of locomotives are required to have an “in-service event recorder” on board. See 49 C.F.R. § 229.135 (2011). The event recorder is similar to an airplane’s “black box” in that it preserves pertinent data regarding the train’s operations, such as speed, horn and bell activation, and distance traveled. The activation of the various systems is reflected by a binary code. Dr. Foster Peterson, Illinois Central’s expert witness, explained:
Basically, the event recorder is doing what we call “sampling” or looking at a number of different channels, different things happening on that locomotive actually many times a second; roughly ten times per second.... The speed and distance are calculated based on the number of revolutions that the wheel is making and how fast it’s making them, things like that. Air pressure, bell and horn; there are various ways to measure, whether it’s electrically or with an air switch or in other ways, all these various events. And so the total, you know, download is telling us what is happening on that locomotive and what the engineer is doing to control it.
Illinois Central downloaded the computerized data from the event recorder data ten days after the accident. At trial, Dr. Peterson stated there was nothing to show that this downloaded event recorder data was inaccurate. Dr. Peterson testified that the event recorder data showed that *999 there was a horn blow and bell warning twelve seconds and approximately 730 feet prior to impact. His testimony regarding the horn activation, that there was an initial activation of the horn for approximately nine seconds and a second activation for approximately three seconds, is consistent with Herndon’s testimony. Dr. Peterson also stated that the train’s bell was activated at the same time and that it continued through the crossing south of the accident.
¶ 14. The Appellees assert that there was “credible evidence ... that the train crew failed to blow the horn.” Six witnesses (including three members of Young’s family), who claimed to have been in the area when the accident occurred, testified on behalf of the Appellees that they did not hear any train horn or whistle. Sandra and Young’s two sisters were inside their homes near the railroad tracks, and all said that they did not hear the train’s horn. The other three witnesses — Shanna Sims, Kim Claiborne, and Deundra Wilson — were in automobiles stopped at the crossing just south of the accident site. Sims and her passenger, Claiborne, had spoken briefly to Young moments before the accident at a nearby intersection. Sims had attempted to drive across the tracks when the railroad crossing warning system came down, which forced her to back up and wait for the train. Sims testified that her window was cracked and that the radio was off. Claiborne also said her window was cracked; she noted the radio was on, but that it was turned “low.” Both women claimed that they did not hear any train horn. Wilson was driving his vehicle on the other side of the railroad tracks when he was forced to stop for the train, with the warning system also coming down upon his vehicle. He claimed that he backed his car up and proceeded in another direction. Wilson also stated that he did not hear the train horn even though his windows were down. None of the three witnesses observed Young’s being hit by the train, although Sims said she saw Young fall down but was not aware she was injured. None of the witnesses provided a statement to the police regarding the accident.
¶ 15. The Appellants contend that the train’s event recorder data is “objective, rehable” evidence that is superior to the eyewitnesses’ testimony. The Appellants cite Russell v. Mississippi Central Railroad, 239 Miss. 741, 749, 125 So.2d 283, 285 (1960), for the proposition that the “[t]he testimony even of disinterested and unimpeached witnesses on the subjects of measurements, distances and the like, which is based merely on memory, estimate or casual observation, must yield to that which is based on actual measurements.” (Quoting S.H. Kress & Co. v. Sharp, 156 Miss. 693, 698, 126 So. 650, 651 (1930)).[5] Thus, the issue before this Court is whether the testimony by six witnesses, that the horn did not blow, must “yield” to the event recorder data’s “objective” physical evidence. We find the testimony of eyewitnesses concerning whether or not a train’s horn was blown is not the same as a witness’s estimate of distance or measurement; thus, Russell is not controlling.
¶ 16. In a recent case from the United States District Court of the Southern District of Mississippi, Brown v. National Railroad Passenger Corporation, No. 3:08cv559KS-MTP, 2011 WL 1130545 (S.D.Miss. Mar. 28, 2011), the district court considered a similar issue involving eyewitness testimony that contradicted the physical evidence of the train’s event recorder data. The specific question there was whether the engineer blew the horn for *1000 900 feet prior to approaching the railroad crossing as required by law. The event recorder data reflected that the tram’s horn was blown continuously for 1,170 feet prior to the crossing. Two witnesses near the train crossing testified the train’s horn blew only once-right before impact. Another witness traveling in a ear next to the train track who witnessed the crash stated he heard the horn. The district court denied the railroad’s motion for summary judgment, finding: “The issue of the train horn is merely a factual dispute between various eyewitnesses and the mechanical event data recorder perfectly capable of being resolved by a properly instructed jury.”[6] Id. at *12; see also Roach v. Nat’l R.R. Passenger Corp., No. 3:09CV634TSL-FKB, 2010 WL 5313403 at *1 (S.D.Miss. Dec. 21, 2010) (Sufficient evidence existed to create a genuine issue of material fact precluding summary judgment, where the event recorder showed that the train horn was properly sounded in a continuous manner prior to the crossing; yet two nearby witnesses testified they only heard a single blow before impact, and the plaintiff merely stated that he thought he heard the horn just before impact.).
¶ 17. Several other jurisdictions have also held that event recorder data is not conclusive evidence so as to remove the issue from the jury. The United States District Court of the Central District of Illinois has held that a dispute between witness testimony and the event recorder data creates a question of fact and will survive summary judgment. In Petersen v. Union Pacific Railroad, 567 F.Supp.2d 1043, 1051 (C.D.Ill.2008), two witnesses stated that the railroad’s crossing warning system was not working properly, although the event recorder data stated that it was. The district court concluded that since the plaintiffs disputed “the accuracy of the [ejvent [rjecorder data[,] ... the [event recorder data] is not controlling.” See also Cimaglia v. Union Pac. R.R., No. 06-3084, 2009 WL 499287 at *4 (C.D.Ill. Feb. 25, 2009) (defendant prohibited from arguing event recorder data was conclusive since this evidence could be “rebutted,” and “an issue of fact remain[ed] on the question of whether the crossing warning system operated properly.”).
¶ 18. In Cornwell v. Union Pacific Railroad, No. 08-CV-638-JHP, 2010 WL 3521668 at *1 (N.D.Okla. Sept. 7, 2010), the event recorder showed that the horn was blown prior to collision; both the engineer and conductor testified that the horn was blown; and “numerous witnesses” in close proximity heard the whistle blow. However, video evidence of the accident contained no sound from the horn, and two witnesses testified that they did not hear a horn. Id. at *4. The United States District Court for the Northern District of Oklahoma held that this constituted a dispute of material fact. Id. at *5.
¶ 19. In Rivers v. CSX Transportation, No. 9-01-59, 2002 WL 533397 (Ohio Ct.App. Apr. 10, 2002), there was evidence in the form of testimony by train personnel and event recorder data that the horn was blown. However, two witnesses in the vicinity “could not recall hearing the train horn,” a nearby resident at his home did *1001 not recall the horn, and another witness driving alongside the track did not hear the horn but admitted he “could not be certain that the whistle sounded although he assumed it did.” Id. at *4. Although the appellate court agreed that the witnesses’ testimony was not sufficient to overcome summary judgment, it concluded that “reasonable minds could differ” as to whether the whistle was blown based on the fact that there was substantial evidence that the appellant, who was not listening to radio, proceeded with caution, and “stated that he did not hear a warning whistle sound.” Id. at *5.
¶ 20. Similarly, in Bouchard v. CSX Transportation, Inc., 196 Fed.Appx. 65 (3rd Cir.2006), a train’s event recorder data indicated that the train’s horn and bell were activated before the application of the emergency brakes. However, a witness stopped at the crossing said he did not hear the horn or bell until the train hit the decedent. Id. at 68. The United States Court of Appeals for the Third Circuit reversed the district court’s grant of summary judgment, concluding:
Pennsylvania case law clearly provides that testimony from a witness who was at the scene to the effect that he did not hear a train’s horn is competent evidence that no horn was blown. While this evidence may not be as compelling as the conflicting evidence presented by CSX from the train’s data recorder log, the weight of the evidence is for the jury, and not the District Judge, to assess.
Id. at 71-72 (internal citation omitted).
¶ 21. We note that there are cases where courts have found eyewitness evidence insufficient to rebut the event recorder data. In a recent case from the Nebraska Supreme Court, Dresser v. Union Pacific Railroad, 282 Neb. 537, 809 N.W.2d 713 (Neb.2011), two victims involved in the accident with a train testified that they did not hear a horn before impact. The Dresser court held:
[ T]he testimony from the engineer and the conductor and the event record data show that the horn was activated. And no evidence supports a reasonable inference that there was some defect which prevented the horn from sounding when activated. To the contrary, the record shows the horn was working properly when it was tested 2 days after the accident. Thus, despite Rosencrans’ and McDonald’s statements that they did not hear the horn, there are no facts upon which a finder of fact could reasonably conclude that the horn did not sound when it was activated.
Id. at 719. In Miller v. Illinois Central Railroad, 474 F.3d 951, 954 (7th Cir.2007), the United States Court of Appeals for the Seventh Circuit held that one witness’s testimony, contradicting the event recorder evidence that the whistle was blown, did not allow plaintiffs to survive summary judgment as the court did “not think a reasonable jury could conclude that the whistle had not been blown, merely because one witness did not recall hearing the whistle years after a very dramatic event[.]” See also Woods v. CSX Transp., Inc., Nos. 2:07-CV-29, 2:07-CV-30, 2008 WL 5070352 at *13 (N.D.Ind. Nov. 24, 2008) (testimony of inattentive witness that horn was not blown was not sufficient to rebut the event recorder data and engineer’s and witness’s testimony that horn was activated) (emphasis added).
¶ 22. In Price v. National Railroad Passenger Corp., 14 P.3d 702 (Utah Ct.App.2000), the Utah Court of Appeals considered testimony from witnesses parked at the train crossing that the train’s horn was not blown prior to the accident. The court noted “that the witnesses were in automobiles with the windows closed and *1002 music playing.” Id. at 708-09. It concluded:
[Although the credibility of negative evidence is generally a question for the jury, “in certain circumstances negative testimony will be insufficient to support a jury verdict.” Curtis v. Harmon Elec., Inc., 575 P.2d 1044, 1047 (Utah 1978). This case presents such a circumstance.
The event recorder from the locomotive provides objective evidence that the horn in fact sounded the standard crossing warning sequence for more than half a minute prior to the accident. Accordingly, we think the negative evidence presented by Plaintiffs does not preserve a genuine issue of material fact, and summary judgment for Defendants on this issue was appropriate.
Id. at 709. However, in Clayson v. Union Pacific Railroad Company, No. 20040783-CA, 2005 WL 2803193 at *2 (Utah Ct.App. Oct. 27, 2005), the same appellate court reversed the lower court’s grant of summary judgment, holding that negative testimony by four witnesses whose “attention was not engrossed or diverted to other things” provided sufficient evidence “from which a jury could conclude each was in a position to hear the train horn.” Unlike Price, one witness in Clayson was outdoors and two other witnesses had their windows rolled up but were listening and “waiting on the crossing gate to raise.” Id. at n. 1. We hold, as did the Clayson court, that the amount of negative testimony (that the witnesses did not hear the warning) is sufficient to create a factual issue for the jury.
¶ 23. The Mississippi Supreme Court has reasoned:
Negative testimony rises or declines in the scale of probative weight according to the opportunity of the negative witnesses to hear and observe; whether their attention was directed to or diverted from the fact in issue; whether the particular fact was an unusual or only a common occurrence in the daily routine of their lives; whether the particular witness was normal in the sense of hearing and sight; and whether observant or indifferent to details.
[[Image here]]
The testimony of witnesses that they did not hear the ringing of the bell on a locomotive as it approached a crossing, without proof that the witnesses listened for the bell, or that their attention was any way directed to it, or that they probably must have heard the bell if it did ring, cannot prevail against the positive testimony of other credible witnesses that the bell did ring at the time in question.
Maxwell v. Ill. Cent. Gulf R.R., 513 So.2d 901, 907 (Miss.1987) (quoting Mobile & O.R. Co. v. Johnson, 157 Miss. 266, 271, 126 So. 827, 828 (1930)) (emphasis added). In Maxwell, a teenager was walking on railroad tracks and was killed by a train. The train engineer and fireman insisted the whistle was sounded, although neither was able to hear it. However, a witness who lived three-quarters of a mile away said he did not hear whistle; neither did the teenager’s step-father, who lived three miles away. Id. at 906-07. The Maxwell court reversed the trial court’s grant of the railroad’s motion for a JNOV, but affirmed the circuit court’s order grant of a new trial, concluding:
In today’s case the greater weight of the credible evidence supports the view that the emergency whistle was sounded. On the other hand, the firmly established rule respecting the authority of courts to intervene when a jury has resolved a question of fact preclude us acting upon that view. Considering the evidence in the light most favorable to *1003 the Plaintiffs, and giving the Plaintiffs the benefit of all favorable inferences that may reasonably be drawn therefrom, and taking the evidence on the issue of the sounding of the whistle in the aggregate, we may not escape the conclusion that there is in this record some credible evidence that the whistle never sounded.
Id. at 907 (emphasis added).
¶ 24. We find that the conflict between the event recorder data and the witnesses’ testimony presented a question of fact for the jury to resolve. Even if we wholly discount the “negative testimony” from Young’s family members who were at home and likely not attentive, as the sounds from the railroad would have become “a common occurrence in the daily routine of their lives,” there still remains testimony from Sims, Claiborne, and Wilson, who were sitting at the nearest railroad crossing and who did not hear the train horn blow. Sims testified she did not “recall” a horn blowing, and there was nothing to affect her ability to hear the horn. Sims stated that she and her passenger, Claiborne, were not listening to the radio and were waiting at the crossing for the train to pass.[7] Sims further said that her window was cracked slightly. Claiborne stated that the radio was on but turned down “low,” that her window was also cracked, and that she did not hear a horn blow. Wilson, whose radio was not on and whose windows were down, also testified that he did not hear a horn blow. Our research has located no case in which a court has found the event recorder data conclusive in opposition to as many eyewitnesses as were presented by the Appellees at trial.
¶ 25. In accordance with Maxwell, while “the greater weight of the credible evidence supports the view” that Herndon blew the horn, we are precluded from “acting upon that view,” as there is “some credible evidence that the [horn] never sounded.” Thus, we affirm the circuit court’s denial of the Appellants’ motion for a JNOV, a directed verdict, and peremptory instructions.[8]
II. Whether the circuit court erred in denying the Appellants’ motion for a new trial.
¶ 26. “A motion for a new trial may be granted in several circumstances including where faulty jury instructions have been given, where the verdict is against the overwhelming weight of the evidence, or where bias, passion, or prejudice have tainted the jury’s verdict.” Fred’s Stores of Tenn., Inc. v. Pratt, 67 So.3d 820, 825 (¶ 24) (Miss.Ct.App.2011) (citation omitted). A jury’s verdict will not be set aside and a new trial ordered unless the verdict is “contrary to the substantial *1004 weight of the evidence so that justice requires that a new trial be granted.” Wells v. Tucker, 997 So.2d 908, 917 (¶ 32) (Miss.2008) (quoting Poole v. Avara, 908 So.2d 716, 727 (¶ 26) (Miss.2005)). “A verdict is deemed against the overwhelming weight of the evidence when no reasonable hypothetical juror could have reached the conclusion of the jury.” Miss. State Fed’n of Colored Women’s Club Housing for Elderly in Clinton, Inc. v. L.R., 62 So.3d 351, 367 (¶ 52) (Miss.2010) (quoting Blossman Gas, Inc. v. Shelter Mut. Gen. Ins. Co., 920 So.2d 422, 426 (¶ 16) (Miss.2006)). We review a denial of a motion for a new trial for abuse of discretion. Meka v. Grant Plumbing & Air Conditioning Co., 67 So.3d 18, 22 (¶ 13) (Miss.Ct.App.2011).
A. Whether the jury’s apportionment of fault was improper and against the weight of the evidence.
¶ 27. Mississippi follows the “comparative negligence doctrine,” which measures negligence “in terms of percentage, and any damages allowed shall be diminished in proportion to amount of negligence attributable to the person for whose injury, damage or death recovery is sought.” Meka, 67 So.3d at 23 (¶ 15) (citations omitted). The Appellants argue that the apportionment of fault in this case— Young, 20%; Herndon, 40%; and Illinois Central, 40%—“is irreconcilable with the facts and the law.”
i. Apportionment of fault to Illinois Central and Herndon
¶ 28. The Appellants contend there was “no basis to split or apportion liability between” Illinois Central and Herndon, its employee. Mississippi Code Annotated section 85-5-7(2) (Supp.2006) states in pertinent part that in any civil action based on fault, “an employer and the employer’s employee or a principal and the principal’s agent shall be considered as one (1) defendant when the liability of such employer or principal has been caused by the wrongful or negligent act or omission of the employee or agent.” The Appellees argue that this distinction is irrelevant as Illinois Central will bear the monetary damages regardless. They state: “The only reasonable interpretation of the jury’s ’4CM0-20’ verdict in this case is that [Illinois Central] bears 80% of the fault for the subject action.”
¶ 29. The Appellants, over objection by the Appellees, submitted a jury instruction form, which allowed apportionment of fault to both Illinois Central and Herndon, separately. In fact, it was the Appellees who argued at trial that Hern-don and Illinois Central should have been “combined” as defendants. Consequently, although the Appellants now argue that both defendants ought to be combined for purposes of recovery, any error in apportioning fault between Illinois Central and Herndon is of the Appellants’ own making. Therefore, we find this issue is waived for consideration on appeal. See Savory v. First Union Nat’l Bank of Delaware, 954 So.2d 930, 934 (¶ 12) (Miss.2007).
ii. Apportionment of fault to Young
¶ 30. The Appellants argue that the jury’s apportionment of 80% fault to the Appellants and only 20% of fault to Young was against the overwhelming weight of the evidence. They refer to the fact that Young suffered from schizophrenia, which she failed to control with medication. The Appellants note that although several family members testified that Young was “fíne” in the months prior to the accident, there was sufficient evidence that Young was still suffering the effects of her illness. Dr. Mark Webb, a psychiatrist who testified at trial, stated in his report: “Ms. Young’s being hit by a train was caused or contributed to by her multi- *1005 pie severe psychiatric illnesses, which in their untreated state all led to poor judgment, impulsivity, unpredictable suicidal thinking, engagement in high risk activities, and reckless disregard for her person and well-being.”
¶ 31. The Appellants further contend that, had she looked, Young would have seen the train, which was 6,903 feet long and weighed 12,096 tons. The accident occurred at mid-day; the weather was clear, and there was unrestricted visibility. There was testimony that, looking up the track from the point of impact, the train would have been visible from over 700 feet away. Furthermore, the train was traveling at only 43 miles per hour and should have been visible to Young for a minimum of fifteen seconds, had she been looking. The Appellants conclude that if Young “had exercised the minimum of care for herself, she would have seen the train and the headlight on the train, and if she had exercised only a minimum of ordinary care, she would have heard the train proceeding down the track on its approach, let alone the warnings sounded by Herndon.” Although much of the testimony regarding Young’s behavior was in conflict with her medical records, there was no evidence demonstrating that Young was experiencing any irrational or symptomatic behavior on the day of the accident. Her sisters and mother testified that she asked for money to buy a cigarette from the store, and an acquaintance, Claiborne, who saw Young on her way home said that she appeared “normal.”
¶ 32. However, we must agree with the Appellants that apportioning only 20% of negligence to Young was against the overwhelming weight of the evidence. Young was a trespasser or licensee to whom the Appellants owed a duty not to “willfully or wantonly” injure her. See Kendrick v. Quin, 49 So.3d 645, 649 (¶ 10) (Miss.Ct.App.2010) (“A landowner owes a licensee and a trespasser the duty to refrain from willfully or wantonly injuring them.”). Once a trespasser or licensee is observed on the tracks, the railroad owes a duty of “reasonable care under the circumstances” to refrain from injuring the person, “but it must be remembered that the circumstances were by definition extreme or emergency circumstances.” Maxwell, 513 So.2d at 905.
¶ 33. Young was walking on the railroad cross-ties, an obviously dangerous activity, with her head down and inattentive to any approaching train.
A railroad-track is a place of danger, and one who goes thereon is bound to know that he is going into a place where he is subject to the dangers incident to the operation of trains upon that track. This is true without regard to the place where the track is, whether in the country, where pedestrians are not expected to be, or at a public road crossing, or at a street crossing, or at the stations and depots of railroad companies, where persons are expected and invited to be present[.] ... [N]o matter where the track is located, any person who goes upon the same is bound to know that he is going upon a place where his presence would be attended with more or less danger. An ordinarily prudent person in the possession of all his faculties would not attempt to cross a railroad-track at any place without using at least his sense of sight, if not that of hearing, to determine whether at the time and place he was about to cross the same there were present any of those dangers which a person of ordinary intelligence would reasonably apprehend.
Holcomb v. Norfolk S. Ry., 295 Ga.App. 821, 673 S.E.2d 268, 270-71 (2009) (quoting Western & A.R. Co. v. Ferguson, 113 Ga. 708, 39 S.E. 306, 308-09 (1901)). “The very presence of a railroad track is a solemn warning. It speaks louder and more *1006 eloquently than words that a dangerous instrumentality may pass it at any movement, and, furthermore, this instrumentality is confined to that track.” Perry v. La. & A. Ry., 142 So. 736, 741 (La.Ct.App.1932). Young not only crossed the railroad track without looking, but she continued to walk, head down, along the side of the track and in harm’s way. Herndon, at the very worse, failed to provide an audible warning, which would have apprised Young of the danger she should have already apprehended.
¶ 34. Based on our thorough review of the record, this Court can only conclude that the jury’s apportionment of fault and its verdict resulted from bias and prejudice against the Appellants, based on the testimony of the Appellees’ expert witness, Dr. Gary Long, that the event recorder data was faulty or had been manipulated in some manner. Dr. Long, over the objection of the Appellants, testified that it was “quite possible” to manipulate and alter the event recorder data. They contend that this was an “unsubstantiated assertion” for which Dr. Long provided no evidence and that Dr. Long “offer[ed] no explanation as to how the data could have been manipulated. or otherwise altered.”[9] We agree.
¶ 35. Dr. Long admitted on cross-examination that he had no evidence that the data was manipulated:
Q. And matter of fact, while Mr. Barrett asked you some questions about fabrications or manipulation of data, isn’t it true, Dr. Long, that in spite of all of your expertise and all of your years of working with this stuff, as you’ve testified to, at your deposition you testified under oath you have no evidence that this data was fabricated or manipulated, did[n’t] you, sir?
A. I have no evidence of that. It could be just error which causes the problem, but that’s a possibility. It could be error or it could be fabricated. I just don’t know.
[[Image here]]
Q. Even today, sir, you have no evidence that this event recorder data is manipulated or fabricated, do you, sir?
A. I don’t.
(Emphasis added). Further, Dr. Long offered no evidence that the event recorder data was “erroneous” or faulty. Although Dr. Long testified that data such as the wheel diameter had to be entered in order to provide accurate data, he furnished no information that the data was incorrectly entered.[10]
¶ 36. In contrast, Dr. Peterson, testified that the data “absolutely” cannot be changed; rather, it merely “can be adjusted to account for time; in other words, known time of day.” Dr. Peterson submitted:
Q. Okay. What, if any, facts are at your disposal that would lead you to believe that this data is manipulated or inaccurate in any way?
*1007 A. I don’t have any evidence that it was manipulated or is inaccurate.
Q. Do you have an opinion to a reasonable degree — do you have any opinion to a reasonable degree of professional certainty as to whether the data on Exhibit 24 is accurate and reliable?
A. I would say that the data is accurate and reliable within the design of the system. I mean, it can only do what it’s designed to do, but in this ease I haven’t seen anything to indicate that it’s not performing as required.
(Emphasis added).[11]
¶ 37. In Smith v. City of Gulfport, 949 So.2d 844, 850 (¶ 19) (Miss.Ct.App.2007), this Court held: “While no specific language, such as “with a reasonable degree of scientific certainty,’ is required, an expert witness must still form his or her opinion with scientific certainty.” (Citing Miss. Transp. Comm’n v. McLemore, 863 So.2d 31, 36 (¶ 11) (Miss.2003)). “The expert’s opinion cannot be mere speculation.” Id.[12] We find that Dr. Long’s testimony is speculative and not based on any scientific principles. Dr. Long provided no scientific basis, data, or studies to support his conclusion that the data was either “erroneous” or “fabricated.”
¶ 38. The United States District Court of the Southern District of Mississippi has rejected identical testimony by Dr. Long. In Brown, the district court concluded: “Dr. Long’s speculative testimony on the alleged fallacy and possible manipulation of the train event data recorder is inappropriate, unsupported by relevant data or evidence, and would not be helpful to the jury.” Brown, 2011 WL 1130545 at *12; see also Vigil v. Burlington N. and Santa Fe Ry. Co., 521 F.Supp.2d 1185, 1198-1205 (D.N.M.2007) (excluding an expert witness’s opinion “that the event recorder data may have been altered or corrupted,” finding it was “pure speculation because [it was] not based on sufficient facts or data.”).
¶ 39. Like the district court in Brown, we find that Dr. Long’s “speculative testimony on the alleged fallacy and possible manipulation of the train event data recorder is inappropriate, unsupported by relevant data or evidence.” We also find it highly prejudicial.
¶ 40. In closing, counsel for the Appel-lees argued:
Expert witness Dr. Gary Long told us about event recorders. You remember that. He said they’re manmade machines, and they certainly can malfunction, and they’re only controlled by the railroad.
[[Image here]]
Let’s go back to Dr. Gary Long’s testimony. In addition to telling us that the event recorder is manmade and can certainly malfunction and is only controlled by the railroad, Dr. Long testified that information in the event recorder can be changed, it can be altered, and it can be manipulated.
[[Image here]]
The event recorder ought to be thrown in the bottom of a gully somewhere after they got through messing with it.
*1008 We can only conclude that the jury relied on this inflammatory and unsupported argument in apportioning fault and rendering the verdict. We find no “reasonable hypothetical juror” could have concluded that Young was only 20% at fault.
¶ 41. The testimony by Dr. Long regarding the “possibility” of the manipulation of data should have been excluded. We find that the verdict was the result of bias and against the overwhelming weight of the evidence; accordingly, we reverse the judgment and remand for a new trial, consistent with this opinion.
B. Whether the amount of the jury verdict is against the overwhelming weight of the evidence.
¶ 42. The jury awarded a general verdict of $2,000,000. In allocating the damages, the circuit court awarded the Appel-lees all requested economic damages and awarded the remainder as noneconomic damages, adjusted to conform to the statutory maximum award. The Appellants claim that the verdict was excessive, citing Young’s mental illness and the fact that she was incapable of caring for her children. Based on our reversal and remand for a new trial on the issue of apportionment of fault, we find it unnecessary to consider this issue on appeal. However, we will address two other issues that may be pertinent on remand — the composition of economic damages and the imposition of punitive damages.
III. Whether the circuit court erred in allowing the jury to consider Young’s future Social Security disability benefits as damages and in denying the Appellants’ motion to exclude Dr. David Channell’s testimony regarding the value of future benefits.
¶ 43. It was stipulated that Young received annual Social Security disability benefits of $6,948. The Appellees sought to have Young’s future disability benefit payments awarded as damages. At trial, the Appellants filed a motion to exclude the expert testimony of an economist, Dr. David Channell, regarding these future disability payments. They argued that the future benefits should not be allowed as damages since Young had not made any contributions to the Social Security system, and Dr. Channell’s testimony was “entirely speculative.” The Appellants reasoned:
Number 1, the benefits that she was receiving at the time of her death are Social Security disability benefits. I could find no Mississippi case that ever allowed the receipt of Social Security disability benefits to be allowed to be projected into the future and then reduced back to present value so as to support a claim for those losses.
And that particularly ought to be the case in this situation where Sharon Young was never employed, never employable, never contributed anything to the Social Security system whereby this-the receipt of those benefits would be something in the nature of a collateral source to which Sharon Young herself had contributed.
The second reason for the exclusion of Dr. Channell’s testimony is that he wishes to take these benefits of some $6,000 a year and project them out over a, quote, work-life expectancy[.]
The circuit court allowed Dr. Channell’s testimony based on Sandra’s testimony that the majority of the benefits had been used to support Young’s children, but determined that work-life expectancy was not an appropriate measure of the future present value of the benefits. Dr. Chan-nell was then allowed to extend the pay *1009 ments for the remainder of Young’s entire life expectancy, rather than her work-life expectancy. Before addressing the issue of Dr. Channell’s expert testimony, we must determine whether Young’s disability benefits are an appropriate element of wrongful-death damages under Mississippi law.
A. Award of future Social Security disability benefits as wrongful-death damages
¶ 44. The Appellants contend that the “net present value” of Young’s future disability benefits “were not intended to be in the nature of a wage loss”; therefore, they are “an improper element of damages in a wrongful death action.” Since this issue has not been addressed by the Mississippi Supreme Court, we requested additional briefing by both parties regarding this issue and as to whether, if such benefits are recoverable and constitute a “loss of support” to Young’s minor representatives, the award survives past the dependents’ majority.
¶ 45. Before addressing these issues, however, we must clarify the type of Social Security benefits that Young received. Although the parties’ arguments suggest that Young’s benefits were Social Security disability income (SSDI), it is apparent from the record and applicable statutory authority that Young, in fact, was receiving Supplemental Security Income (SSI). In order to receive SSDI, a person under age 24, such as Young, would have been required to meet a “recent work” test and must have been employed for at least “1.5 years of work during the three-year period ending with the quarter [her] disability began.” SSA Pub. No. 05-10029 (June 2012); see also 20 C.F.R. § 404.130, § 404.315 (2012). It is undisputed that Young only worked a few months and was disabled due to her mental illness. Furthermore, the 2005 rate for SSI payments for a twelve-month period was $6,948, the precise amount of benefits stipulated by the parties. See http://www.ssa.gov/ pressoffice/factsheets/colafacts 2005-alt. htm. Therefore, we will limit our analysis specifically to the issue of whether a decedent’s SSI benefits may be awarded as damages in a wrongful-death suit.
¶ 46. Mississippi’s wrongful-death statute, section 11-7-13 of the Mississippi Code Annotated (Rev.2004), states, in pertinent part:
Except as otherwise provided in Section 11-1-69, in such action the party or parties suing shall recover such damages allowable by law as the jury may determine to be just, taking into consideration all the damages of every kind to the decedent and all damages of every kind to any and all parties interested in the suit.
(Emphasis added). The Appellees contend that “the plain meaning of the language of the statute ... cast[s] an all-inclusive net in which future Social Security disability payments must be included as an elements of damages.” Indeed, the Mississippi Supreme Court has interpreted this statutory language to be “far-reaching” and “clear.” See Choctaw Maid Farms, Inc. v. Hailey, 822 So.2d 911, 922 (¶ 48) (Miss.2002).[13]
*1010 ¶ 47. The supreme court has determined that the wrongful-death statutory language encompasses the following damages: “(1) the present net cash value of the life expectancy of the deceased, (2) the loss of the companionship and society of the decedent, (3) the pain and suffering of the decedent between the time of injury and death, and (4) punitive damages.” McGowan v. Estate of Wright, 524 So.2d 308, 311 (Miss.1988) (citations omitted). The Appellants argue that the “present net cash value of the life expectancy would not include a lifetime stream of Social Security disability income, such as that claimed by Sharon Young’s beneficiaries in this case.” They claim the present net cash value must be based upon the “actual earnings of the decedent in his employment.” The Appellants cite cases from other jurisdictions that have disallowed an award of future Social Security disability benefits as damages, as they are not considered to be a result of the decedent’s labor or earnings. See Murdoch v. Commonwealth, 110 Pa.Cmwlth. 74, 531 A.2d 1164, 1166 (1987) (“The measure of a decedent’s loss is what he would have probably earned by his intellectual or bodily labor and his business or profession during the residue of his life.”); W.L. Harper Co. v. Slusher, 469 S.W.2d 955, 959 (Ky.1971) (“The measure of damages in a wrongful death action ... is the damage to the estate by the destruction of the decedent’s power to labor and earn money.”).
¶ 48. Although a “power to labor” requirement has not been mandated by the Mississippi Supreme Court, as far back as New Deemer Manufacturing Co. v. Alexander, 122 Miss. 859, 897, 85 So. 104, 107 (1920), the supreme court stated wrongful-death damages are “rooted in the earnings of the decedent during his expectancy.” (Emphasis added). Then, in Belzoni Hardwood Co. v. Cinquimani, 137 Miss. 72, 95, 102 So. 470, 474 (1924), the supreme court held “that these earnings are recoverable as damages to the parties interested, and not as damages to the decedent.” (Emphasis added). Subsequently, in Bush v. Watkins, 224 Miss. 238, 243-44, 80 So.2d 19, 21-22 (1955), the supreme court made clear that the proper element of damages was the “present net cash value” of the deceased, which was based, in that case, on the projected net earnings of the decedent. More recently, in Rebelwood Apartments RP, LP v. English, 48 So.3d 483, 496 (¶ 57) (Miss.2010), the supreme court held that the determination of a decedent’s lost future income as damages is to ensure a “ ‘reasonable and workable system for establishing damages’ [and] to replace what has been lost.” (Citing Culver v. Slater Boat Co., 722 F.2d 114, 121 (5th Cir.1983)). “The paramount concern of a court awarding damages for lost future earnings is to provide the victim with a sum of money that will, in fact, replace the money that he would have earned.” Id. (quoting Culver, 722 F.2d at 120) (emphasis added).
¶ 49. We find that Young’s SSI benefits are not the type of benefits “rooted in the earnings of the decedent” as outlined in New Deemer, and may not be awarded as the present net cash value of the decedent. Under the Social Security Act, SSI was established for the aged, blind, and disabled to “assure a minimum level of income for people who are age 65 or over, or who are blind or disabled and who do not have sufficient income and resources to maintain a standard of living at the established Federal minimum income level.” 20 C.F.R. § 416.110 (2012) (emphasis added). “SSI payments are a form of public assistance and have nothing to do with earnings a person may have had.” Tenn. Dep’t of Human Servs. ex rel. Young v. Young, 802 S.W.2d 594, 597 (Tenn.1990).
*1011 ¶ 50. However, our analysis does not end here. As noted, the language of the wrongful-death statute is broad and includes “all damages of every kind to any and all parties interested in the suit.” Sandra testified that “[a]bout 90 percent” of Young’s Social Security benefits was used to support Young’s two children, although we observe this would have left Young with a mere $57.90 per month for her personal use.[14] The Appellants provided no evidence to contradict this testimony. The Appellees rely on Kwasny v. United States, No. 80 C 2198, 1986 WL 9184 (N.D.Ill. Aug. 15, 1986), and McKinnis v. United States, No. 06 cv 4965, 2008 WL 5220504 (N.D.Ill. Dec. 10, 2008), to support the award for Young’s future benefits. In Kwasny, the decedent’s veteran’s disability payments were awarded to his family, as they relied on the payments for support. Kwasny, 1986 WL 9184 at *14. In McKinnis, the United District Court for the Northern District of Illinois denied the award of the decedent’s disability benefits as damages to his children, but noted that had the children relied on the decedent for support, they “might” have a right to assert the loss of benefits “as damages they sustained.” McKinnis, 2008 WL 5220504 at *7 (emphasis added).
¶ 51. In Avery v. Collins, 171 Miss. 636, 649, 157 So. 695, 699 (1934), the Mississippi Supreme Court held that damages were recoverable for “the present net value of any pecuniary benefits which the evidence discloses that the beneficiaries had a reasonable expectation of receiving from the decedent during their respective lives had he continued to live[.]” In Scott v. K-B Photo Service, 260 So.2d 842, 844 (Miss.1972), the supreme court observed that the intent of the wrongful-death statute “was to largely limit damages to those that the injured person could have recovered if he had not died. To these could be added damages that his heirs might have suffered because of their personal relationship with the deceased, such as support and loss of companionship.” (Emphasis added); see also Boyd Constr. Co. v. Bilbro, 210 So.2d 637, 643 (Miss.1968) (minor children entitled to recover for the loss of support due to the wrongful death of their mother).
¶ 52. In addressing this issue of loss of support, or “gratuities,” to wrongful-death beneficiaries, the Mississippi Supreme Court determined in New Deemer that recovery of the present net cash value of the deceased and loss of support would not be permitted, as this would be considered “double damages.” New Deemer Mfg., 122 Miss. at 897, 85 So. at 107 (emphasis added). However, the supreme court’s restriction on loss-of-support damages in New Deemer was due to the fact that the decedent’s only source of support for his beneficiaries was his earnings.
The rights other than for loss of companionship, protection, and society of all the parties is rooted in the earnings of the decedent during his expectancy. So far as the present case is concerned ... the suit may be brought by one for all, or all may join in one suit, and the jury are to consider all the rights that all of the plaintiffs have and all damages that fall to each of them. But it is manifest that so far as the support is concerned that such support had the decedent lived must come out of his earnings. There was no other source of income in the present case for these benefits to flow from.
Id. (emphasis added).
¶ 53. Unlike New Deemer, Young did have a “source of income” other than earnings from which she supported her chil *1012 dren. The SSI benefits. We find that on remand, loss of support to Young’s children would be an appropriate category of damages. Accordingly, if the testimony on remand reflects that Young’s two children, Tasandra and Shiron, relied on Young’s SSI for support, they may have individual claims for a portion of these future SSI benefits for the length of time that the jury reasonably determines Young would have continued that support.[15]
¶ 54. As a result, we find that the circuit court erred in allowing the total amount of Young’s calculated future SSI benefits, based upon her life expectancy, to be considered by the jury. The circuit judge stated that the benefits should be allowed as damages as they went “for the care and benefit of the children”; yet the award that does not consider the amount of support and the number of years the children would have been dependent upon the mother is not an accurate measure of their damages.
B. Dr. Channell’s Expert Testimony
¶ 55. At trial, Dr. Channell acknowledged that he was not an expert on “Social Security regulations concerning the qualification and payment of [disability] benefits.” He was accepted by the court, rather, as an expert in economics and finance. Dr. Channell calculated that Young’s future disability benefits would be $212,057, and the jury was allowed to consider this as an element of economic damages.[16]
¶ 56. The Appellants objected to this testimony at trial and, on appeal, the Appellants reassert that Dr. Channell’s testimony was “inherently speculative” and “should have been excluded due to a lack of sufficient foundational facts and a reliable methodology.” Specifically, they note Dr. Channell’s lack of expertise concerning Social Security regulations and his failure to consider Young’s schizophrenia when calculating her life expectancy.
¶ 57. Mississippi has adopted the standards from Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), in determining whether testimony by an expert witness will be admitted. “The Daubert test consists of a two-prong inquiry: (1) the trial court must establish whether the expert testimony is relevant, meaning that *1013 it will aid the fact-finder; and (2) the trial court must determine whether the expert testimony is reliable.” Vanlandingham v. Patton, 35 So.3d 1242, 1248 (¶ 32) (Miss.Ct.App.2010) (citation omitted). Mississippi Rule of Evidence 702 states that an expert witness may testify “if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.” Rule 702 and Daubert “require trial courts to act as ‘gatekeepers’ with regard to expert opinion testimony, because juries tend to place great weight on the testimony of experts and can be misled by unreliable opinions.” Sherwin-Williams Co. v. Gaines ex rel. Pollard, 75 So.3d 41, 45 (¶ 13) (Miss.2011) (citation omitted).
¶ 58. We find no error in the circuit court’s denial of the Appellants’ motion to exclude Dr. Channell’s testimony. The supreme court has previously recognized and allowed expert testimony by Dr. Channell regarding the calculation of life expectancy and personal consumption to determine a damage award. See Greyhound Lines, Inc. v. Sutton, 765 So.2d 1269, 1279 (¶ 27) (Miss.2000). In this case, Dr. Channell used the same studies/tables and methodology that he utilized in Greyhound in determining Young’s estimated benefits. We find his testimony was both relevant and reliable.
¶ 59. In Illinois Central Railroad v. Hawkins, 830 So.2d 1162, 1183 (¶ 61) (Miss.2002), the supreme court addressed a similar argument by Illinois Central in regard to Dr. Channell’s testimony, holding:
[Illinois Central] makes no arguments why his figures are wrong other than referring to other testimony regarding [decedent’s] sporadic work history and mental problems. This Court finds that this other testimony addresses the problem [Illinois Central] sees with Channell’s figures, in that it rebuts his conclusion that she would have had a permanent minimum wage job. As this Court has stated, “when evidence is in conflict, the jury is the sole judge of both the credibility of a witness and the weight of his testimony.” Weathersby Chevrolet Co. v. Redd Pest Control Co., 778 So.2d 130, 133 [ (¶ 10) ] (Miss.2001). Thus, this was a fact issue lying in the province of the jury, and we find no abuse of discretion in allowing this testimony.
The Appellants presented no evidence to rebut Dr. Channell’s testimony and report, except to note Young’s mental illness and to question whether her life expectancy should have been shorter based upon this fact. On remand, if the Appellants wish to provide additional evidence, they may do so; however, nothing in the record supports their argument that Dr. Channell’s testimony was insufficiently reliable or speculative.
160. Consequently, we find no error in the circuit court’s denial of the Appellants’ motion to exclude Dr. Channell’s testimony.
CROSS-APPEAL
¶ 61. As the circuit court found no evidence “that could arise to the level of actual malice or gross negligence on the part of the defendant,” the issue of punitive damages was not presented to the jury for consideration. The Appellees have filed a cross-appeal, asserting that the court committed reversible error by refusing to allow punitive damages to be considered by the jury.
¶ 62. “Mississippi law does not favor punitive damages; they are considered an extraordinary remedy and are *1014 allowed ‘with caution and within narrow limits.’ ” Warren v. Derivaux, 996 So.2d 729, 738 (¶ 27) (Miss.2008) (quoting Life & Cas. Ins. Co. of Tenn. v. Bristow, 529 So.2d 620, 622 (Miss.1988)). However, punitive damages may be awarded when the “plaintiff shows by clear and convincing evidence that the defendant ‘acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud.’” Id. at (¶ 26) (citing Miss. Code Ann. § 11-1-65(1)(a) (Rev.2002)). A circuit court’s decision whether to submit the issue of punitive damages to a jury is reviewed for abuse of discretion. Prudential Ins. Co. of Am. v. Stewart, 969 So.2d 17, 32-33 (¶ 56) (Miss.2007) (citation omitted).
¶ 63. The Appellees contend that Illinois Central “had actual knowledge that its railroad track in essentially all of Tchula was commonly used by pedestrians as a longitudinal and lateral pathway.” They reference two prior accidents in Tchula several years prior concerning pedestrians struck by a train, and they claim Illinois Central’s “persistent indifference to public safety” warranted the imposition of punitive damages. Counsel for the Appellees stated at trial:
Our sole theory of recovery is failure to sound the warning, the horn. And the failure to fence was just part of the acquiescence that went into it in the analysis leading to their elevated duty of reasonable care.
¶ 64. The supreme court has held “that prior-accident evidence is admissible to show the railroad’s knowledge of a dangerous condition at the crossing, only when the prior-accident evidence involves accidents which are ‘similar.’ ” Irby v. Travis, 935 So.2d 884, 892 (¶ 17) (Miss.2006) (citing Ill. Cent. R.R. v. Williams, 242 Miss. 586, 605, 135 So.2d 831, 839 (1961)). In this case, the other two accidents were extremely remote in time from this one — one was fourteen years prior and the other was thirty-three years prior. Neither was in the same location where Young was killed. Therefore, we find the prior incidents irrelevant to this case.
¶ 65. As to the duty owed to Young, the Mississippi Supreme Court has stated:
It is settled in this State that the servants of a railroad company in charge of its train are under no duty to keep a lookout for trespassers on the railroad track, and are required only to exercise reasonable care to prevent injuring a trespasser after they have discovered and realized his peril. The test of responsibility arises when the engineer becomes aware of the presence and peril of the trespasser. Until made aware of the presence and peril of the trespasser, there could not be wilful negligence or wanton misconduct toward an unrecognized, undiscerned trespasser.
See Ill. Cent. Gulf R.R. v. Ishee, 317 So.2d 923, 925 (Miss.1975) (internal citations and quotations omitted). Further, in Maxwell, the supreme court noted:
If the trespasser is an adult and apparently in possession of his faculties, ... the engineer is entitled to expect the person to hear the warning signals and remove himself from danger.... Specifically, then, upon seeing a person in danger, the “reasonable duty” has been fleshed out to mean that the whistle is to be blown if there is time within which this may be done.
Maxwell, 513 So.2d at 905-06 (citation omitted).
¶ 66. The Appellees submit that the train crew failed to sound the train’s horn and merely “watched their 42-mph train approach a pedestrian from behind for over seventeen (17) seconds.” They *1015 contend that “under the circumstances of this case[, this] was clearly gross negligence evidencing a willful, wanton, or reckless disregard for the safety of others.” Furthermore, the Appellees note the jury’s finding of negligence against the Appellants, stating that “[t]he jury must have believed that the horn did not blow.” Thus, the Appellees argue that enough evidence was presented to “compel submission of the issue of punitive damages to the jury.” We disagree.
¶ 67. Herndon testified that he saw Young and blew the horn as a warning; the event recorder data confirms his testimony. The Appellees submitted contrary evidence by witnesses that the horn was not blown. While the Appellees’ evidence is sufficient to survive a JNOV, we find that it is not clear and convincing evidence that Illinois Central or Herndon acted with malice or reckless disregard for Young’s safety. Accordingly, we find no error in the circuit court’s finding that the issue of punitive damages should not be submitted to the jury. This issue is without merit.
¶ 68. THE JUDGMENT OF THE HOLMES COUNTY CIRCUIT COURT IS REVERSED, AND THIS CASE IS REMANDED ON DIRECT APPEAL FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. THE JUDGMENT IS AFFIRMED ON CROSS-APPEAL. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEES/CROSS-APPEL-LANTS.
GRIFFIS, P.J., ISHEE, ROBERTS, MAXWELL AND FAIR, JJ., CONCUR. IRVING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY LEE, C.J., CARLTON AND RUSSELL, JJ.

. Mississippi Code Section 11 — 1—60(2)(b) (Supp.2005) provides that for any civil action filed on or after September 1, 2004, a plaintiff may not be awarded "more than One Million Dollars ($1,000,000.00) for noneconomic damages.” Neither party has challenged the circuit court's allocation between economic and noneconomic damages on appeal.

. These amounts reflect the 20% apportionment of fault attributable to Young.

. Archie concerned a pile of burning cross-ties that was blocking a "beaten path” on the tracks frequently used by pedestrians. When David Archie attempted to cross over the burning pile by walking on a cross-tie that had been placed over a ditch "forming a make-shift bridge,” he fell and was seriously injured. Archie, 709 F.2d at 288. The Fifth Circuit Court of Appeals held that whether the railroad had knowledge of the path and its frequent use was a question of fact for the jury. Id. at 290. In another case mentioned by the Appellees at trial, Illinois Central Railroad v. Dillon, 111 Miss. 520, 524, 71 So. 809, 811 (1916), the Mississippi Supreme Court held that the railroad had a "common-law duty” to warn when it had knowledge that the unofficial path was frequently used by approximately 150-200 workers at nearby factories. "[A] plank had been put over a ditch by employees of the railroad company at the point where the pedestrians crossed said railroad.” Id. at 522, 71 So. at 810. Thus, as the supreme court observed: "In this case the conduct of the railroad company was an implied invitation to pedestrians to use this crossing. This case is very different from one where only a few people are in the habit of crossing the railroad track at a certain point not at a public crossing[J” Id. at 524, 71 So. at 811 (emphasis added and citation omitted).

. The Appellants objected to the language accusing Illinois Central of knowledge and acquiescence; however, they do not challenge Jury Instruction P-3 on appeal.

. Russell concerned photographic evidence and engineer surveys that completely contra-dieted oral testimony. Id. at 748-49, 125 So.2d at 285.

. While our case concerns a motion for a JNOV, not summary judgment, both concern whether the testimony creates an issue of fact for a jury to resolve. In finding there to be a genuine issue of material fact for trial, the Brown court acknowledged: "There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.” Brown, 2011 WL 1130545 at *3 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) (emphasis added).

. We acknowledge that the veracity of some of the witnesses’ testimony in this case was questioned by the Appellants at trial. For instance, Sims claimed that she drove her car across the tracks immediately after the accident, even though the photos and testimony show the train was blocking the crossing for approximately an hour after the accident. The Appellees’ expert witness admitted that he could not "understand how [that testimony] could have been true,” concluding that the witnesses must have been "mistaken.” However, the issue of a witness's credibility is for the jury to determine. Noblin v. Burgess, 54 So.3d 282, 289 (¶ 22) (Miss.Ct.App.2010). Also, there was unimpeached testimony by Wilson that the horn was not blown.

. This Court reaches its conclusion without considering the testimony offered by the Ap-pellees’ expert witness, Dr. Gary Long, as to the "possibility” that the event recorder data could be manipulated. Compare Brown, 2011 WL 1130545 at *12; Roach, 2010 WL 5313403 at n. 3. Dr. Long’s testimony will be discussed infra with regard to the Appellants’ motion for a new trial.

. We note that while the Appellants detailed their argument regarding Dr. Long's testimony in the portion of the brief supporting a JNOV, they incorporated their arguments by reference in their request for a new trial.

. According to Dr. Peterson and Dr. Long, the event recorder data requires an input of the wheel diameter to accurately record pertinent data, such as speed, braking, and the timing of the utilization of the horn and whistle. Dr. Peterson testified that the diameter of the wheel is "important because that’s what’s letting the event recorder software calculate for how many times that wheel turned, how far did it actually travel, the distance and how fast was it traveling. So you’re adjusting the data for those — those things that have to be input by the user.” However, as Dr. Peterson stated, the input of the wheel diameter is required to calculate "speed and distance travel.” It does not affect the operation of the train’s horn or whistle.

. Further, when asked about the likelihood that the event recorder would show the horn being blown when it was not, Dr. Peterson testified: “Not that I can come up with.” Rather, he said that the data was far more likely to fail to show activation even though the horn was blown, usually attributable to mechanical or electrical issues.

. Although the Appellants objected to Dr. Long’s testimony regarding "possibilities,” they did not challenge his expert testimony under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), or McLemore, 863 So.2d 31.

. In Choctaw Maid, the supreme court allowed the award of hedonic damages to compensate for the loss of the enjoyment of life. In 2003, the Mississippi Legislature rejected the right to hedonic damages by enacting Mississippi Code Annotated section 11-1-69(2) (Supp.2008), which states: “In any wrongful death action, there shall be no recovery for loss of enjoyment of life caused by death.” While this legislative action provided the opening clause in section 11-7-13, the language regarding the award of "all damages of every kind” has remained.

. The Appellees’ expert witness used a thirty-percent consumption rate in the calculations.

. Other jurisdictions have analyzed whether to award future disability benefits as damages based upon the loss of support to the beneficiaries. In Estate of Holt v. State Farm Fire & Casualty Co., 151 Wis.2d 455, 444 N.W.2d 453 (1989), the Wisconsin Court of Appeals held that a decedent’s Social Security disability benefits could be awarded damages in the nature of a "pecuniary injury” to the beneficiary. "[T]he source of income is not determinative in deciding whether a beneficiary has sustained a pecuniary injury.” Id. at 459, 444 N.W.2d 453; compare Hartman v. Dermont, 89 A.D.2d 807, 453 N.Y.S.2d 464 (N.Y.App.Div.1982) (emancipated children of sixty-four-year-old deceased mother, who did not rely on decedent for support, were not entitled to disability benefits as they sustained no "pecuniary loss”); Quatroy v. Jefferson Parish Sheriff's Office, Nos. 04-451, 04-1425, 2009 WL 961261 at *5 (E.D.La., Apr. 7, 2009) (claim for award of father's Social Security disability benefits denied because son failed to provide any evidence of support from the income).

. The jury awarded a general verdict of $2,000,000. The circuit court amended the jury's verdict, reducing the net award to the Appellees to $1,174,761. The net award contained all economic damages considered by the jury, including the loss of Social Security disability benefits.
This figure submitted by Dr. Channell represents $302,940, which is the estimated total amount of disability benefits over Young's life expectancy, minus a thirty-percent reduction based upon personal consumption. This figure was then decreased in the circuit court’s judgment to $169,646 to reflect Young’s 20% allocation of fault.