**IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI**

**NO. 2014-CA-00853-COA**

MICHAEL MCDONALD AND SHARON
CRUTCHFIELD

APPELLANTS

v.

LEMON-MOHLER INSURANCE AGENCY, LLC

APPELLEE

DATE OF JUDGMENT: 04/08/2014
TRIAL JUDGE: HON. SAMAC S. RICHARDSON
COURT FROM WHICH APPEALED: JACKSON COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANTS: LES W. SMITH
ATTORNEYS FOR APPELLEE: DAVID A. BARFIELD
STEVEN LLOYD LACEY
NATURE OF THE CASE: CIVIL - INSURANCE
TRIAL COURT DISPOSITION: PARTIALLY GRANTED THE APPELLEE'S
MOTION FOR A DIRECTED VERDICT
AND DENIED THE APPELLANTS'
MOTION FOR A JUDGMENT
NOTWITHSTANDING THE VERDICT OR,
IN THE ALTERNATIVE, A NEW TRIAL
DISPOSITION: AFFIRMED - 12/15/2015
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE LEE, C.J., CARLTON AND FAIR, JJ.**

**CARLTON, J., FOR THE COURT:**

¶1. In January 2005, Danny Jalanovich entered into an agreement with Michael

McDonald and Sharon Crutchfield (collectively, the McDonalds)[1] to complete construction

_____

[1] By the time this lawsuit reached trial, Sharon had married Michael. As a result, the
parties' briefs refer to the Appellants collectively as the McDonalds. For the sake of clarity,
we likewise refer throughout our opinion to the Appellants together as the McDonalds.

of a home in Ocean Springs, Mississippi. The McDonalds agreed to satisfy the bank note on the property and to advance all funding necessary to finish the project. In exchange, Jalanovich conveyed the property to the McDonalds by warranty deed. The parties planned to sell the home for a profit, at which point the McDonalds would receive their financial investment back with interest.

¶2. Before construction on the project was finished, Hurricane Katrina completely destroyed the home. After their insurance claim was denied, the McDonalds filed the present action in Jackson County Circuit Court against Lemon-Mohler Insurance Agency LLC and various other defendants. The McDonalds' complaint asserted claims for intentional and negligent misrepresentation, negligence, and gross negligence.

¶3. After the McDonalds presented their case-in-chief, the circuit court granted Lemon-Mohler's motion for a directed verdict as to the claims for intentional misrepresentation and gross negligence. Following the parties' presentation of all their testimony and evidence, the jury returned a verdict in favor of Lemon-Mohler, finding that the McDonalds' negligence constituted the sole proximate cause of their loss. The McDonalds then filed an unsuccessful motion for a judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial.

¶4. On appeal, the McDonalds raise the following issues: (1) whether the circuit court erred by granting Lemon-Mohler's motion for a directed verdict as to the issue of gross negligence; (2) whether the circuit court erred by not granting the McDonalds' motion for a JNOV or, in the alternative, a new trial; (3) whether the circuit court's evidentiary rulings

2

irreparably prejudiced the jury; and (4) whether the circuit court erred by limiting the McDonalds' proffer of compensatory damages to $440,000.

¶5. Finding no error, we affirm.

**FACTS**

¶6. In 2004, Jalanovich's company, Anchor Realty and Development Inc., bought waterfront property in Ocean Springs. Anchor planned to build a home on the property and then sell the home for a profit. To finance the home's construction, Anchor obtained a loan from Hancock Bank. In September 2004, Anchor obtained a windstorm policy on the property for $440,000 from Mississippi Wind Underwriters Association (MWUA).[2] MWUA issued the windstorm policy and directly billed Anchor for the premium payments. In addition to the windstorm policy, Anchor purchased a builder's risk policy on the property. Lemon-Mohler provided service to Anchor on both policies as the producing agent.

¶7. Anchor fully paid the premium on the builder's risk policy. However, Jalanovich arranged a four-part installment plan to pay the premium on the windstorm policy. Although

---

[2] The Mississippi Legislature established MWUA in 1987 "to provide insurance coverage against wind and hail to residents of the Mississippi Gulf Coast." *Fonte v. Audubon Ins.*, 8 So. 3d 161, 163 n.1 (Miss. 2009). *See also* Miss. Code Ann. § 83-34-1(f) (Rev. 2011) (stating that the Mississippi Gulf Coast includes Hancock, Harrison, Jackson, Pearl River, Stone, and George Counties). "MWUA is responsible for the issuance of policies; however, once MWUA determines a policy should issue, a member company acts as a servicing insurer and provides service on the policy." *Fonte*, 8 So. 3d at 163 n.1. Mississippi Code Annotated section 83-34-15(2) (Rev. 2011) establishes that "coverage [by MWUA] shall be dependent upon the timely payment and actual receipt by [MWUA] of premiums or premium installments as provided for at the time of application."

Anchor paid the windstorm policy's initial installment in September 2004, Anchor failed to make any further payments. Thus, when the second installment on the windstorm policy became due in December 2004, Anchor failed to send MWUA any payment for the amount. Due to Anchor's failure to pay the amount owed, MWUA cancelled the windstorm policy effective January 27, 2005. As stated in the cancellation notice MWUA sent to Anchor, the amount due to continue coverage under the windstorm policy totaled $660.93.

¶8. MWUA sent Lemon-Mohler a copy of the pending policy cancellation. On January 3, 2005, Darlene Fountain, a Lemon-Mohler customer-service representative, prepared and mailed a courtesy letter to Anchor about the pending cancellation. Fountain testified at trial that her courtesy letter would have been the fourth notice sent to Anchor. According to Fountain's testimony, Lemon-Mohler received copies of the bills MWUA sent Anchor on November 12, 2004, and again on December 17, 2004. The November letter informed Anchor that its second payment was due on December 9, 2004, and the second letter informed Anchor that its payment was overdue. MWUA then sent Anchor a third notice that the windstorm policy would be cancelled on January 27, 2005, due to nonpayment of the premium. Finally, on January 3, 2005, Fountain sent Anchor a fourth letter stating that Lemon-Mohler had received a copy of the notice from MWUA about the pending policy cancellation. As the record reflects, MWUA issued the windstorm policy to Anchor as the owner of the policy, but Jalanovich owned Anchor. Although Jalanovich admitted during cross-examination that the notices may have been mailed to his office at Anchor, he denied

4

that he ever personally received or read any of the four notices about the windstorm policy's pending cancellation.

¶9.   In addition to Anchor's failure to pay the windstorm policy's premium, Anchor also fell behind on its payments to Hancock Bank.  Anchor's owner, Jalanovich, contacted Pat Coffee, who knew Michael McDonald.  The three men worked out an agreement as to the funding and completion of the project, and on January 12, 2005, the McDonalds executed an agreement with Anchor.  The McDonalds agreed to satisfy the property's bank note and advance all necessary construction funding for the project.  In exchange, Anchor agreed to convey the property to the McDonalds by warranty deed as security for their investment.  The agreement also provided that the McDonalds would receive all their money back, with interest, once the property was sold.  In addition, the parties agreed that Anchor would continue to oversee construction of the house.  According to the testimony elicited at trial, construction on the house was forty percent to fifty percent complete at the time Anchor and the McDonalds executed their agreement.

¶10.   On January 27, 2005, MWUA cancelled Anchor's windstorm policy due to Anchor's failure to pay the policy premium.  The following day, on January 28, 2005, Anchor conveyed the property to the McDonalds by warranty deed.  Prior to finalizing their agreement, the McDonalds asked Jalanovich whether the property was insured, and Jalanovich responded affirmatively.  However, the McDonalds never personally contacted Lemon-Mohler to confirm that their new property had insurance coverage, and they required

5

no proof of insurance from Jalanovich. The McDonalds also obtained no other insurance of their own on the property. Instead, in March 2005, the McDonalds asked Coffee and Jalanovich to double check that the property was covered for hurricane damage and to ensure that all project participants were included on Anchor's existing policies.

¶11. According to the testimony and evidence presented at trial, Lemon-Mohler maintained activity logs on its clients' accounts. Lemon-Mohler's activity log for Anchor's account showed all the activity and communications entered into Lemon-Mohler's computer about Anchor's insurance policies. The activity log reflected that, on March 23, 2005, Fountain spoke to Jalanovich about Anchor's policies. During the conversation, Jalanovich specifically authorized Fountain to also speak to Coffee later that day about Anchor's policies.

¶12. Fountain testified that Coffee inquired about making certain changes to Anchor's builder's risk and windstorm policies. As reflected in the activity log, in response to Coffee's questions, Fountain told Coffee that she could change the mortgagee named on both the builder's risk policy and the windstorm policy. The activity log further showed that, approximately ten minutes after speaking to Coffee, Fountain changed the mortgagee on the builder's risk policy to reflect Michael's name[3] and added Coffee as an additional insured on the builder's risk policy.[4] Although these changes to the builder's risk policy could be

---

[3] The builder's risk policy had previously identified Hancock Bank as the mortgagee.

[4] Anchor had previously been the only insured named on the builder's risk policy.

6

made easily online, Fountain testified that Anchor had to complete a change-request form for MWUA before she could make the requested change to the windstorm policy. To process the request to add Michael as the new mortgagee on the windstorm policy, Fountain prepared a change-request form for Anchor to pick up and complete. The paperwork instructed Jalanovich to return the completed form to either Lemon-Mohler or MWUA so the requested change to the windstorm policy could be processed. As the record reflects, however, Jalanovich never returned the change-request form to either Lemon-Mohler or MWUA.

¶13. Fountain testified at trial that she possessed no knowledge of the windstorm policy's cancellation when she spoke to Jalanovich and Coffee on March 23, 2005. Fountain stated that the two men only asked her about adding an insured to the policy and changing the policy's mortgagee. The testimony in the record reflects that, to view any billing or payment information on Anchor's policies, Fountain would have had to open a completely separate screen. Because neither Jalanovich nor Coffee inquired about billing or payment, Fountain testified she had no reason to check this information. Therefore, she never opened the separate screen. Fountain further testified that, had Jalanovich sent back the change-request form for the windstorm policy as directed, then she would have mailed the form to MWUA, and the cancelled policy would have been discovered by Lemon-Mohler much sooner. Fountain testified that MWUA would have informed Lemon-Mohler of the cancelled windstorm policy, and then Lemon-Mohler could have contacted Anchor about the need for new insurance coverage.

7

¶14. As the record reflects, Jalanovich never completed and returned to Lemon-Mohler the change-request form for the windstorm policy. In addition, Fountain testified that no one ever contacted her again to follow up on the requested changes to the windstorm policy. Furthermore, Fountain testified that no one ever informed her that ownership of the property had changed from Anchor to the McDonalds. The record instead indicates that, on April 27, 2005, Lemon-Mohler's accounting department received notice that Anchor's windstorm policy was cancelled, effective on January 27, 2005, due to a failure to pay the premium. Fountain testified, though, that she had no reason to reopen the activity log on Anchor's account to discover the cancellation since no one ever contacted her about the account after the March 23, 2005 conversations.

¶15. The record reflects that Anchor's windstorm policy with MWUA required Jalanovich to notify MWUA of any change in ownership over the property. No evidence was presented at trial, however, to show that Jalanovich ever informed MWUA of the change of ownership. According to Fountain, Jalanovich also failed to inform her that he had sold the property. Although Jalanovich testified that Fountain assured him the property had full hurricane coverage through September 9, 2005, Fountain testified that Jalanovich never informed her that he failed to pay the premium on Anchor's windstorm policy. Fountain testified that, had she known about the failure to pay the windstorm premium or the property's transfer to the McDonalds, she would have instructed Jalanovich to immediately speak to an insurance producer. In addition, Lemon-Mohler could have accommodated the McDonalds or helped

8

them obtain their own insurance policy.

¶16.  During her testimony, Fountain stated that her clients normally called her whenever they sold their home, property, or business to have her cancel their insurance.  Also, Fountain testified that clients who made new purchases usually called Lemon-Mohler to insure the purchases.  However, Fountain testified that she never received notice from Jalanovich, Coffee, or the McDonalds that the property at issue had changed ownership.

¶17.  During its case-in-chief, Lemon-Mohler tendered Debra Shempert as an expert witness in the field of insurance.  The circuit court accepted Shempert as an expert witness with respect to the customs, standards, and practices of insurance agencies from 2004 until the present.  The circuit court also accepted Shempert as an expert on the management and operation of an insurance agency.

¶18.  During her testimony, Shempert distinguished direct-billed policies from agency-billed policies.  Under Anchor's windstorm policy with MWUA, which was a direct-billed policy, Anchor received billing notices and information directly from MWUA rather than from its agent, Lemon-Mohler.  In fact, Shempert testified that insurance agents were taught to let the billing company handle matters related to direct-billing policies and to not "get in the middle of that."  As a result, Shempert testified that Lemon-Mohler bore no duty to send Anchor the January 3, 2005 courtesy letter to remind Anchor to make its premium payment to MWUA.  In fact, Shempert testified that Fountain actually went above and beyond the applicable standard when she sent the January 3, 2005 courtesy letter.  Furthermore,

9

Shempert stated that, under Anchor's policies, Lemon-Mohler possessed no duty to the McDonalds because the McDonalds were never Lemon-Mohler's insureds.

¶19.    In testifying that Lemon-Mohler's conduct met the standards applicable to insurance agencies, Shempert stated that Fountain's and Lemon-Mohler's actions actually exceeded expectations regarding efficiency.  When Fountain received the request to add Michael's name as a mortgagee to the builder's risk policy, she completed that change within a matter of minutes.  Furthermore, in response to the request to add Michael's name as a mortgagee on the windstorm policy, Fountain generated the necessary form within minutes for Jalanovich to complete and submit to MWUA.  Based on these facts, Shempert concluded that Lemon-Mohler's timely response to requested changes exceeded industry standards.

¶20.    As the trial testimony reflected, on August 29, 2005, the force of the winds generated by Hurricane Katrina completely destroyed the house being built on the McDonalds' property.  The McDonalds, Coffee, and Jalanovich reported the loss to Lemon-Mohler and filed a claim.  However, the McDonalds then learned that MWUA had cancelled the property's windstorm policy earlier on January 27, 2005, due to Anchor's failure to pay the premium and that the builder's risk policy provided no coverage for wind or flooding.

¶21.    On August 29, 2007, the McDonalds filed a complaint against Lemon-Mohler and various other defendants, asserting claims based on intentional and negligent misrepresentation, negligence, and gross negligence.  At the close of the McDonalds' case-in-chief, Lemon-Mohler moved for a directed verdict on all claims.  The circuit court granted

10

Lemon-Mohler's motion as to the claims for intentional misrepresentation and gross negligence. Following the completion of the trial, the jury returned a verdict in favor of Lemon-Mohler because it found the McDonalds' negligence constituted the sole proximate cause of their loss.[5] The McDonalds filed an unsuccessful motion for a JNOV or, in the alternative, a new trial. Aggrieved by the jury's verdict and the circuit court's denial of their motion, the McDonalds now appeal to this Court.

## DISCUSSION

### I. Whether the circuit court erred by granting Lemon-Mohler's motion for a directed verdict as to the issue of gross negligence.

¶22. The McDonalds argue that Lemon-Mohler acted with gross negligence when dealing with Jalanovich and Coffee, the McDonalds' representatives. The McDonalds allege that Lemon-Mohler first acted with gross negligence on March 23, 2005, when Fountain failed to provide Jalanovich and Coffee with truthful and accurate information about the windstorm policy's coverage and to inform the men that the windstorm policy had been cancelled. The McDonalds assert that Lemon-Mohler's gross negligence continued when, after receiving the Mississippi Insurance Commission (the Commission) statement on April 27, 2005, and discovering the windstorm policy's cancellation, Lemon-Mohler failed to follow up with Jalanovich and Coffee and to notify them of the lapsed coverage. Due to this alleged gross

_____

[5] The circuit court submitted the following interrogatory to the jury: "Do you find from a preponderance of the evidence that the [McDonalds'] negligence and/or misrepresentations, if any, were the sole proximate cause of their damages, if any?"

11

negligence by Lemon-Mohler, the McDonalds contend the circuit court erred by granting a directed verdict as to their gross-negligence claim.

¶23. In *Brown v. Anderson*, 80 So. 3d 878, 881 (¶7) (Miss. Ct. App. 2012), this Court stated:

> We review the grant of a directed verdict de novo, considering the evidence in the light most favorable to the non-moving party and giving that party all reasonable favorable inferences from the evidence presented at trial. If the facts and inferences create a question of fact from which reasonable minds could differ, a trial court should not grant a directed verdict but instead submit the matter to the jury.

(Internal citations omitted).

¶24. In applying this well-known standard to the facts here, we acknowledge that the threshold for submitting the question of gross negligence to the jury is higher than the threshold for submitting the question of simple negligence. *See Allen v. Blanks*, 384 So. 2d 63, 67 (Miss. 1980). Our precedent acknowledges that "[t]here is no precise definition of gross negligence, but one of the approximate definitions may be thus expressed: Gross negligence is that course of conduct which, under the particular circumstances, discloses a reckless indifference to consequences without the exertion of any substantial effort to avoid them." *Dame v. Estes*, 233 Miss. 315, 318, 101 So. 2d 644, 645 (1958).[6] To defeat Lemon-Mohler's motion for a directed verdict, the McDonalds had to show by a preponderance of

---

[6] *See also Mut. Life Ins. of N.Y. v. Estate of Wesson*, 517 So. 2d 521, 528 (Miss. 1987), *abrogated by Gen. Am. Life Ins. v. McCraw*, 963 So. 2d 1111 (Miss. 2007) (discussing the sufficiency of the evidence necessary to recover punitive damages in bad-faith insurance cases).

the evidence that Lemon-Mohler acted willfully, wantonly, or with reckless disregard of the consequences to the McDonalds. *See generally Lowe v. Ala. & Vicksburg Ry.*, 81 Miss. 9, 9, 32 So. 907, 908 (1902) (finding that the plaintiff bore the burden to prove willfulness, wantonness, or lack of reasonable care).

¶25.     "Absent a statutory requirement or policy provision, an insurer has no duty to provide notice of the termination of a policy." *Lowery v. Guar. Bank & Trust*, 592 So. 2d 79, 83 (Miss. 1991). "However, when a duty exists, actual receipt of the notice may be presumed by proof of ordinary mailing, but this presumption may be rebutted by the insured who contends that he or she did not actually receive the notice. Mere denial of receipt is insufficient to create a triable issue of fact." *Luedke v. Audubon Ins.*, 874 So. 2d 1029, 1032-33 (¶10) (Miss. Ct. App. 2004) (citation omitted). As this Court acknowledged in *Luedke*, MWUA can cancel a policy for nonpayment of the premium. *Id.* at 1034 (¶17).

¶26.     In moving for a directed verdict, Lemon-Mohler argued the evidence failed to show that it acted with gross negligence with respect to the McDonalds. Lemon-Mohler also asserted that the McDonalds never became the agency's clients. Instead, Lemon-Mohler contended that Jalanovich, as Anchor's owner, was Lemon-Mohler's customer and that Lemon-Mohler only served as the producing agent for Anchor and Jalanovich. Lemon-Mohler further asserted that the insurance agreement for the windstorm policy existed between MWUA and Anchor, as set forth in Anchor's windstorm application and policy. Under the terms of MWUA's windstorm policy, Lemon-Mohler argued that it possessed no

13

duty to provide either Jalanovich or the McDonalds any notice of Jalanovich's nonpayment of the premium or MWUA's cancellation of the policy for nonpayment.

¶27. In addition to asserting that only Anchor and Jalanovich constituted the agency's clients, Lemon-Mohler argued that Jalanovich himself arranged the four-part installment plan with MWUA to pay for Anchor's windstorm premium but then failed to make any payments after the initial down payment. To support its motion for a directed verdict, Lemon-Mohler relied on evidence and testimony showing that MWUA mailed Anchor, and therefore Jalanovich, two bills and a notice of cancellation about the overdue premium payment. As the record reflects, MWUA mailed these items to Anchor by certified mail without requiring a return receipt.[7] The record further reflects that MWUA terminated the windstorm policy effective January 27, 2005, due to nonpayment of the windstorm policy's premium. The next day, on January 28, 2005, Jalanovich transferred the property to the McDonalds by warranty deed.

¶28. As discussed in the recitation of the facts in this case, prior to transferring the property to the McDonalds, Jalanovich verbally represented to the McDonalds that he possessed insurance on the property. In March 2005, Michael asked Jalanovich to change the insurance policy to identify him as the mortgagee. However, the record shows that MWUA had already

---

[7] *See generally Stingley v. Redland Ins.*, 943 So. 2d 86, 89 (¶12) (Miss. Ct. App. 2006) (discussing the cancellation of a workers' compensation policy for nonpayment of the premium).

cancelled the windstorm policy the day before the McDonalds became the owners.[8]  The record further shows that neither Lemon-Mohler nor MWUA received notice that Jalanovich had transferred the property to a new owner.

¶29.  The McDonalds argue that, through Jalanovich and Coffee, who acted as their personal representatives, they detrimentally relied on the information Fountain provided during the March 23, 2005 phone conversations.  To recover based on a theory of equitable estoppel, a party must show reliance upon the acts of another and that the party suffered a detriment due to such conduct.  *See Brown v. Progressive Gulf Ins.*, 761 So. 2d 134, 137 (¶11) (Miss. 2000); *O'Neill v. O'Neill*, 551 So. 2d 228, 232 (Miss. 1989).  A party seeking to recover based upon such detrimental reliance must show good-faith reliance upon the actions of the other party and must have clean hands.  *Id.* at 232-33.

¶30.  In the present case, the record clearly reflects that the McDonalds never became Lemon-Mohler's clients and that no communication occurred between Lemon-Mohler and the McDonalds.  The record further shows that Lemon-Mohler owed the McDonalds no duty under any contract.  Moreover, the McDonalds' recovery is precluded by their inability to show good-faith reliance upon Lemon-Mohler's verbal representations or conduct.  As the record demonstrates, Jalanovich, Lemon-Mohler's actual client, lacked clean hands in this

---

[8] *See* Miss. Code Ann. § 83-11-5 (Rev. 2011) ("[W]here cancellation is for nonpayment of premium[,] at least ten (10) days' notice of cancellation accompanied by the reason therefor shall be given[.]").  *See also Brown v. Progressive Gulf Ins.*, 761 So. 2d 134, 135-36 (¶¶4-6) (Miss. 2000) (discussing the cancellation of automobile insurance due to nonpayment of the policy premium).

15

matter because he failed to pay his premium installments and misrepresented that his property was insured. Jalanovich also failed to complete the change-request form Fountain prepared for him to submit to MWUA in March 2005 to accomplish the requested changes to his policies. In addition, the record reflects that the McDonalds failed to ascertain whether insurance coverage actually existed at the time they purchased the property from Jalanovich on January 28, 2005.

¶31. Lemon-Mohler asserted that Jalanovich never disclosed to the agency or its employees that he had sold the property to the McDonalds or that he had failed to pay his windstorm policy premium. Due to Jalanovich's failure to make his premium payments and to provide truthful and accurate information, Lemon-Mohler contended that Jalanovich could not reasonably believe that his windstorm policy remained effective. Furthermore, Lemon-Mohler argued it possessed no duty to the McDonalds since they never became Lemon-Mohler's customers. Lemon-Mohler argues on appeal that the evidence before the jury proved the McDonalds engaged in no direct communications with Lemon-Mohler and never applied for or procured their own insurance with Lemon-Mohler.[9] Since the windstorm policy at issue cancelled before the McDonalds took ownership of the property, the McDonalds failed to create a question of fact to support their claim of gross negligence. *See Brown*, 761 So. 2d at 137 (¶10).

---

[9] We note that the doctrine of equitable estoppel requires a party to show that he detrimentally relied on the actions of another party. *See Brown*, 761 So. 2d at 137 (¶11).

¶32. In applying our standard of review, which requires us to view the evidence in the light most favorable to the McDonalds, the nonmoving party, and to give the McDonalds all reasonable inferences from the evidence presented, we find the record fails to reflect a question of fact from which reasonable minds could differ. *See Brown*, 80 So. 3d at 881 (¶7). We therefore find no error in the circuit court's grant of a directed verdict to Lemon-Mohler on the claim of gross negligence. This assignment of error lacks merit.

## II. Whether the circuit court erred by not granting the McDonalds' motion for a JNOV or, in the alternative, a new trial.

### A. Motion for a JNOV

¶33. After considering the parties' evidence and testimony, the jury returned a verdict finding that the McDonalds' negligence constituted the sole proximate cause of their loss. When polled by the circuit court, eleven of the twelve jurors stated that they voted for the verdict. On appeal, the McDonalds contend that insufficient evidence supported the jury's verdict and that the circuit court erroneously denied their motion for a JNOV.

¶34. A motion for a JNOV challenges the legal sufficiency of the evidence. *United Servs. Auto. Ass'n v. Lisanby*, 47 So. 3d 1172, 1176 (¶8) (Miss. 2010). This Court reviews de novo the circuit court's denial of the McDonalds' motion for a JNOV. *See id.* We consider the evidence in the light most favorable to Lemon-Mohler, the nonmovant, and we affirm the circuit court's denial of the motion for a JNOV where substantial evidence supports the verdict. *See id.*

¶35. According to the testimony of Shempert, Lemon-Mohler's insurance expert, Lemon-

17

Mohler's conduct failed to violate any industry standards or practices. Instead, Shempert testified that Lemon-Mohler's actions exceeded industry standards. Furthermore, Shempert testified that Jalanovich, not the McDonalds, was the named insured on the insurance policies and that Lemon-Mohler possessed no duty to the McDonalds.

¶36. Although Jalanovich informed the McDonalds that their new property was covered, the record reflects that Jalanovich failed to pay the premium on the windstorm policy he obtained. As a result, MWUA mailed Jalanovich three notices regarding the nonpayment and eventually cancelled the windstorm policy. In addition, even though Jalanovich neglected to pay the windstorm policy's premium, Fountain testified that Jalanovich failed to inform her of this fact during their March 2005 conversation. Fountain also testified that no one ever informed her that Anchor had sold the property to the McDonalds.

¶37. According to Fountain's testimony, clients usually told her when they sold property so they could cancel their insurance. Fountain also stated that most clients who purchased new property usually called to obtain insurance for their new property. In further support of the jury's verdict, the record contained evidence that the McDonalds admitted during their trial testimony that they never directly contacted Lemon-Mohler to inquire about insurance coverage, to procure their own insurance policy, or to inform Lemon-Mohler that they had purchased the property from Anchor. The record instead reflects that the McDonalds relied solely on Jalanovich and Coffee, as their representatives, to ensure that the property had the appropriate coverage through Anchor's existing policies.

18

¶38. Although Fountain provided Jalanovich with the form for the requested change to the windstorm policy, the record establishes that Jalanovich never completed and returned the form. Furthermore, the record reflects that Jalanovich, Coffee, and the McDonalds never followed up with Fountain regarding the requested changes to the windstorm policy. Shempert stated that the McDonalds bore the responsibility to follow up with Lemon-Mohler but that they failed to do so. Shempert further testified that, in her experience, clients usually followed up when they failed to receive information they requested. According to Fountain, had the change-request form been completed and returned as instructed, the cancelled policy would have been discovered sooner, and new insurance coverage could have been arranged.

¶39. The record contains sufficient evidence for a jury to find that the McDonalds' negligence constituted the sole proximate cause of their loss. *See Lisanby*, 47 So. 3d at 1176 (¶8). The record reflects evidence that the McDonalds were negligent in purchasing their new property because they required no proof of insurance from Jalanovich, and they failed to obtain any insurance of their own. Considering the evidence in the light most favorable to Lemon-Mohler, we find substantial evidence supported the circuit court's denial of the McDonalds' motion for a JNOV. *See id.* We therefore find this issue lacks merit.

### B. Motion for a New Trial

¶40. The McDonalds also assert the jury's verdict was contrary to the overwhelming weight of the evidence. This Court reviews the denial of a motion for a new trial for abuse of discretion. *Lisanby*, 47 So. 3d 1172, 1176 (¶9). "As with motions for [a] JNOV, we

19

review the evidence in the light most favorable to the nonmoving party and will reverse only when, upon review of the entire record, we are left with a firm and definite conviction that the verdict, if allowed to stand, would work a miscarriage of justice." *Id.* (citation omitted). "A verdict is deemed against the overwhelming weight of the evidence when no reasonable hypothetical juror could have reached the conclusion of the jury." *Ill. Cent. R.R. v. Young*, 120 So. 3d 992, 1004 (¶26) (Miss. Ct. App. 2012) (citation omitted).

¶41.    At trial, Lemon-Mohler presented testimony to show that Anchor, not the McDonalds, constituted Lemon-Mohler's client since Anchor was the insured named on MWUA's windstorm policy.  The record reflects that the windstorm policy indeed named Anchor as the insured and provided Anchor's correct mailing address.  Lemon-Mohler also presented evidence that Anchor either knew or should have known about the windstorm policy's cancellation since Jalanovich, Anchor's owner, failed to make the installment payments on the premium.  Additional testimony presented by Lemon-Mohler's witnesses reflected that the McDonalds were never Lemon-Mohler's clients, the McDonalds bore the responsibility for obtaining insurance on their new property, and the McDonalds failed to take the proper steps to secure insurance coverage.  Finally, Lemon-Mohler presented expert testimony stating that the actions of Lemon-Mohler's employees, and their efficiency in responding to customer requests, exceeded industry standards and practices.

¶42.    Although the McDonalds attempted to contradict Lemon-Mohler's evidence and testimony, our caselaw recognizes that determinations as to the weight and worth of

20

testimony and the credibility of witnesses fall within the jury's province. *See Abrams v. Marlin Firearms Co.*, 838 So. 2d 975, 981 (¶24) (Miss. 2003). After considering the testimony from the parties and their experts, the jury returned a verdict in favor of Lemon-Mohler. Upon review of the record and Mississippi caselaw, we find no abuse of discretion in the circuit court's denial of the McDonalds' motion for a new trial. *See Lisanby*, 47 So. 3d at 1176 (¶9). Viewing the evidence in the light most favorable to Lemon-Mohler, we cannot say that allowing the verdict to stand sanctions a miscarriage of justice. *See id.* Thus, we find this argument lacks merit.

> **III.    Whether the circuit court's evidentiary rulings irreparably prejudiced the jury.**

¶43.    The McDonalds next assert that several of the circuit court's evidentiary rulings prejudiced the jury or, in the alternative, reflected bias by the circuit court. Specifically, the McDonalds contend the following evidentiary rulings resulted in error: (1) not allowing the McDonalds to use leading questions to directly examine witnesses who were either an adverse party or identified with an adverse party; (2) not allowing the McDonalds to question witnesses on redirect examination about matters raised during cross-examination; (3) not allowing the McDonalds to cross-examine Shempert about articles by an authoritative source who directly contradicted some of Shempert's opinions; and (4) not allowing the McDonalds to recross Shempert about the matters raised during her redirect examination. Arguing that these various rulings severely prejudiced them, the McDonalds ask this Court to remand the case for a new trial.

21

## A.  Direct Examination of Witnesses by Leading Questions

¶44.    During their case-in-chief, the McDonalds called the following four witnesses, who were either current or former employees of Lemon-Mohler:  (1) Rhonda Hall, a former Lemon-Mohler account manager and customer-service representative; (2) Fountain, a former Lemon-Mohler customer-service representative; (3) Debra Mohler, the former accountant for Lemon-Mohler and the wife of Mark Mohler; and (4) Mark Mohler, the president of Lemon-Mohler.

¶45.    When calling Mark as a witness, the McDonalds' attorney specifically said, "Your Honor, at this time we would call the representative of Lemon-Mohler, adversely, who is present in [c]ourt, the adverse party, Mark Mohler—or[,] excuse me, Mark Mohler, who is here representing Lemon-Mohler."  Prior to calling Mark, the McDonalds called Hall, Fountain, and Debra to testify.  In calling each of these three women to testify, the McDonalds failed to specifically inform the circuit court that they considered the women adverse-party witnesses.  On appeal, the McDonalds argue that Mississippi caselaw contains no such requirement and that "[i]t was patently obvious that the witnesses were being evasive in their responses to the questions in many instances[.]"  As a result, the McDonalds contend the circuit court erred by refusing to let them ask the witnesses leading questions during direct examination.

¶46.    In *Bailey v. State*, 952 So. 2d 225, 236 (¶24) (Miss. Ct. App. 2006), this Court acknowledged:

[Mississippi Rule of Evidence] 611(c) states that[,] while leading questions should ordinarily be allowed only on cross-examination, leading questions on direct examination are appropriate when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party. The decision to allow leading questions is one that rests within the discretion of the trial court, and we will reverse such a decision only upon a showing of abuse of discretion.

¶47. Upon review, we find no abuse of discretion arising from this alleged assignment of error. Although the testimony given by Hall, Fountain, and Debra established that each woman was a former employee of Lemon-Mohler, the record reflects that the McDonalds' attorney never informed the circuit court that he wished to designate the women as adverse-party witnesses. Even though the McDonalds argue on appeal that the witnesses' answers were often evasive, they fail to direct this Court's attention to any specific instances where the women responded evasively or refused to answer questions. Furthermore, despite the McDonalds' claims, the record reflects that the circuit court allowed the McDonalds to ask the three women a number of leading questions. In addition, where necessary, the circuit court instructed the witnesses to answer the questions asked of them.

¶48. Unlike the other three witnesses, the record reflects that the McDonalds specifically designated Mark as an adverse-party witness. During Mark's redirect examination, the McDonalds attempted to impeach him using his deposition testimony. However, Lemon-Mohler objected on the ground of improper use of the deposition. Outside the jury's presence, the circuit court instructed the McDonalds' attorney on the proper use of a deposition for impeachment purposes. As the record reflects, the circuit court had previously

23

been forced to address this issue with the McDonalds' attorney. *See* M.R.E. 611(a) (stating that the court shall exercise reasonable control over the mode and order of witness interrogation and evidence presentation).

¶49. Following the discussion on the proper use of deposition testimony, the McDonalds' attorney stated:

> Well, Your Honor, this witness is an adverse party that I get to lead. As a part of that leading, is Your Honor telling me that[,] in cross-examining an adverse[-]party witness, that I have to give [him] a chance to explain any testimony that is different from the way [he] testified in a deposition?

After reviewing the court reporter's transcript notes to confirm that the McDonalds did, in fact, call Mark as an adverse-party witness, the circuit court replied, "The only fair way to do it, regardless of whether he's adverse or not, it's just like a yes-or-no question. The witness is going to be allowed to explain [his] answer if [he] deem[s] that it's necessary, and I'm going to let him do that." The circuit court provided further clarification by stating, "I didn't say you had to ask [the witness to explain the inconsistency]. I'm saying he's got the right to if he chooses[.]"

¶50. After reviewing the record and applicable caselaw, we find no abuse of discretion in the circuit court's rulings. *See Bailey*, 952 So. 2d at 236 (¶24); M.R.E. 611. We further find that no irreparable prejudice resulted due to the circuit court's rulings on this issue. As a result, we find the McDonalds' claim lacks merit.

**B.     Redirect Examination About Matters Raised During Cross-examination**

24

¶51. As previously discussed, during their case-in-chief, the McDonalds called Hall and Debra as witnesses. The McDonalds assert that certain matters were discussed during Lemon-Mohler's cross-examination of these two witnesses, and that, on redirect examination, the McDonalds sought to ask further questions about the elicited testimony. However, the McDonalds claim the circuit court abused its discretion by refusing to let them question the two witnesses about the matters raised during cross-examination. The McDonalds further argue the circuit court's rulings prevented them from testing the accuracy and veracity of the witnesses' testimony.

¶52. "The scope of redirect examination, while largely within the discretion of the trial court, is limited to matters brought out during cross-examination. However, we will not disturb a trial court's ruling on matters pertaining to redirect examination unless there has been a clear abuse of discretion." *Thompson v. State*, 157 So. 3d 844, 854 (¶33) (Miss. Ct. App. 2015) (citation omitted).

¶53. After reviewing the record, we find no clear abuse of discretion resulting from the circuit court's rulings. With regard to Hall's testimony, the record reflects that, during Lemon-Mohler's cross-examination of her, the following exchange occurred:

> Q.     In the April 27[, 2005] communication about, we got this Commission Statement, the policy is cancelled for nonpayment, that's a completely different thing than a Notice of Cancellation from the Wind Pool, isn't it?
>
> A.     Yes.
>
> Q.     And again, a Commission Statement is not something that's distributed

Lemon-Mohler wide. It goes to the accountant in the Accounting Department; correct?

A.   That's correct.

¶54.   During the McDonalds' redirect examination of Hall, the McDonalds asked whether, in her deposition, Hall testified "that if[,] in March of [2005], someone had looked in the Lemon-Mohler . . . file, meaning the file, the computer, whatever, [she] would have known—the Customer Service Representative[—]would have known that the premium had not been paid?" Lemon-Mohler timely objected on the ground that the question fell outside the scope of its cross-examination, and the circuit court sustained the objection.

¶55.   In reviewing the above excerpt from Lemon-Mohler's cross-examination of Hall, we find the excerpt simply reflects that there was an April 27, 2005 communication; a Commission statement is different from a notice of cancellation; and Commission statements are sent to Lemon-Mohler's accounting department rather than the entire insurance agency. The record reflects that the questions during cross-examination clearly differed from the matter the McDonalds sought to investigate on redirect examination.

¶56.   After reviewing the rest of the transcript from Lemon-Mohler's cross-examination of Hall, the record reflects that the following exchange also took place:

Q.   Now, [you] were asked also about[,] it doesn't say anything in [the activity log's March 23, 2005 entry] that the bills were paid, that the premium was paid. And importantly, it also doesn't say in there that the policy was finally cancelled, does it?

A.   No.

Q.      Not in that [March 23, 2005] log entry, does it?

A.      No.

¶57.    After reviewing the McDonalds' assignment of error as to Hall's testimony, the record shows no abuse of discretion. *See Thompson*, 157 So. 3d at 854 (¶33). The record fails to support the McDonalds' claim that the circuit court prevented the McDonalds from testing the accuracy and veracity of the witness's testimony or caused the McDonalds to suffer irreparable prejudice.

¶58.    We next consider the McDonalds' assertion that the circuit court abused its discretion by refusing to let them question Debra about a matter raised during her cross-examination. During Lemon-Mohler's cross-examination of Debra, the following exchange occurred:

Q.      Now, did you also . . . [say during your] deposition that you would not necessarily have contacted the [customer-service representative] in this case?

A.      Not always; that's correct.

Q.      And that you would not necessarily have contacted [her] in this case; correct?

A.      Correct.

Q.      Did you [say] that in your deposition?

A.      I believe I did.

Q.      You said you believe you did. I want to confirm that with you if we could. If you'll look at page 78 of your deposition. The question begins on line 16, right. What I'm saying is that[,] from looking at this, you would have contacted the [customer-service representative], and you left it up to the [customer-service representative] to handle it from

27

there.  Your answer is, not necessarily; correct?

A.    Correct.

¶59.    During the McDonalds' redirect examination of Debra, the following exchange occurred:

Q.    And in the deposition—[i]n fact, you specifically said that you contacted Ms. Fountain on April 27th, or a day or two before, didn't you?

Mr. Barfield: Objection, Your Honor.  There was nothing that said that in the deposition.  Also, it's outside the scope of cross.

The Court:    Sustained as to outside the scope of [cross-examination].

Mr. Philpot:  Your Honor, he was asking about—his last question was that she testified that she didn't remember talking to Darlene Fountain at all about this particular instance.  She testified in her deposition she specifically did, and the day.

The Court:    Put the jury in the jury room.

After the jury left the courtroom, the circuit court judge stated, "I'm going to try to explain this deposition business one last time, and this is the last time."  After instructing the McDonalds' attorney once more on the proper use of deposition testimony to impeach a witness, the circuit court judge further stated, "You're using [the deposition] to elicit testimony.  It's objectionable, and I'm going to sustain every one of them."

¶60.    Upon review, we again find no evidence to show that the circuit court's ruling subjected the McDonalds to irreparable prejudice warranting the need for reversal and a new trial. *See Thompson*, 157 So. 3d at 854 (¶33).  The record contains sufficient evidence to

28

support the circuit court's rulings regarding the mode and order of witness interrogation. *See* M.R.E. 611(a). Because we find no abuse of discretion, we find that this assignment of error lacks merit.

### C. Cross-examination of Shempert About Articles that Contradicted Several of Her Opinions

¶61. The McDonalds next argue that the circuit court erred by refusing to let them cross-examine Shempert about articles written by Chris Amrhein, who was mentioned during Shempert's deposition. This Court reviews the circuit court's limitation of cross-examination for abuse of discretion. *Thornton v. State*, 905 So. 2d 745, 746 (¶5) (Miss. Ct. App. 2004). If we find an abuse of discretion, we will only reverse where a party's substantial right was affected. *Id.*

¶62. In previously addressing the scope of cross-examination, the supreme court has stated:

> [C]ounsel conducting cross-examination is entitled to broad discretion in the subject matter of the questioning. The trial court has discretion to restrict that latitude when the subject matter of questioning has no relevance. However, lack of relevance will be found only when the information that counsel is attempting to elicit is wholly extraneous and unprovoked by direct examination. One is deprived of the right to cross-examine when the trial court fundamentally and substantially restricts it.

*Culp v. State*, 933 So. 2d 264, 276 (¶33) (Miss. 2005) (internal citations omitted).

¶63. While cross-examining Shempert, the McDonalds' attorney asked whether she considered Amrhein an authoritative source. The attorney also attempted to ask whether Shempert had identified Amrhein as an authoritative source in her deposition testimony. Following Lemon-Mohler's objection, the circuit court recessed the trial to read Shempert's

29

deposition testimony. As the record reflects, the following discussion occurred during Shempert's deposition:

> Q.   [D]id you refer to any manuals or any of this material from any of these sources that you've told me that were authoritative sources?
>
> A.   No, sir. I referred to my [twenty-eight] years [of] experience.
>
> Q.   Okay. All right. And the authoritative sources you gave me [were] that A-A—
>
> A.   A-S-C-R.
>
> Q.   A-S-C-R.
>
> A.   Uh-huh (indicating yes).
>
> Q.   And then what else?
>
> A.   The speaker that goes throughout the nation doing the [Errors and Omissions Seminar], Chris [Amrhein] was his name.
>
> Q.   Okay. And who is he with?
>
> A.   He is an independent contractor [who] works for the Independent Agents['] Association.
>
> Q.   Okay. That's it. The Independent Agents['] Association. So anything from the Independent Agents['] Association, I take it you would consider that to be authoritative?
>
> A.   Yes.

¶64.   After reviewing Shempert's deposition testimony, the circuit court found that Shempert indicated she considered anything that came through or was put on by the Independent Agents' Association to be authoritative. Although Shempert said Amrhein

30

spoke at the Independent Agents' Association's events and that she had attended some of his seminars, the circuit court found Shempert never specifically said she considered Amrhein, individually, to be authoritative. Based on his review of Shempert's deposition testimony, the circuit court concluded that the McDonalds' attorney could question Shempert about the following topics: (1) whether Shempert considered the Independent Agents' Association to be authoritative; (2) whether Amrhein attended the Independent Agents' Association's events; and (3) whether Shempert attended Amrhein's seminars at the Independent Agents' Association's events. Once trial resumed, the McDonalds' attorney proceeded to cross-examine Shempert about Amrhein, his reliability as a speaker, and the seminars he taught.

¶65. On appeal, the McDonalds argue that Amrhein constituted an authoritative source and that Shempert clearly identified him as such during her deposition. As a result, the McDonalds argue the circuit court erred by refusing to allow them to question Shempert about Amrhein's articles that contradicted some of Shempert's opinions. The McDonalds further assert that the circuit court's ruling prejudiced them because the ruling prevented the jury from balancing Shempert's testimony against the contradictory opinions expressed in Amrhein's articles.

¶66. Our review of the record shows sufficient evidence existed to support the circuit court's ruling. Therefore, the record reflects no abuse of discretion. *See Thornton*, 905 So. 2d at 746 (¶5). As a result, we find no merit to the McDonalds' assertion that the circuit court's ruling reflected bias or caused them irreparable prejudice. We therefore find this

31

assignment of error lacks merit.

### D. Recross-examination of Shempert About the Matters Raised During Her Redirect Examination

¶67.     Following Lemon-Mohler's redirect examination of Shempert, the McDonalds' attorneys asked to recross Shempert about the matters raised during the redirect examination. The circuit court denied the request, however, and on appeal, the McDonalds argue the circuit court erred in its ruling.

¶68.     In addressing the issue of recross-examination, this Court has previously stated:

> Article 3, Section 26 of the Mississippi Constitution of 1890 guarantees criminal defendants the right to cross-examine witnesses against them, but recross-examination is not allowable as a matter of right, but a matter of trial court discretion.  Thus, the standard of review for a trial court's denial of re[]cross-examination is abuse of discretion.  Furthermore, the Mississippi Supreme Court has held:
>
>> It is proper to exclude questions as to matters which were not opened up or brought out on redirect examination, or as to matters already fully covered, or discussed at length on cross-examination, where there is no claim of oversight and no reason stated why the matter was not inquired into on the cross-examination proper.

*Moore v. State*, 1 So. 3d 871, 874-75 (¶13) (Miss. Ct. App. 2008) (internal citations and quotation marks omitted).

¶69.     Upon review, we find no abuse of discretion by the circuit court's refusal to allow the McDonalds to recross Shempert about the matters raised during her redirect examination. *See id.*  We therefore find this issue lacks merit.

### IV.     Whether the circuit court erred by limiting the McDonalds'

32

**evidence of compensatory damages to $440,000.**

¶70. In their final assignment of error, the McDonalds argue that the circuit court erroneously limited the evidence of their compensatory damages to $440,000, which constituted the face value of Anchor's windstorm policy with MWUA. "The standard of review regarding admission or exclusion of evidence is abuse of discretion. Where error involves the admission or exclusion of evidence, [an appellate court] will not reverse unless the error adversely affects a substantial right of a party." *Lisanby*, 47 So. 3d at 1179 (¶25) (citation omitted).

¶71. During her direct examination, Sharon McDonald testified that she attended the closing for the property she and her husband, Michael, purchased from Anchor. Sharon also testified that, the same day, she wrote checks to pay the bank, the subcontractors, and the property taxes. When Sharon was asked to provide the total amount that the McDonalds paid at the closing, Lemon-Mohler objected. Citing the supreme court's holding in *Eastland v. Gregory*, 530 So. 2d 172, 174 (Miss. 1988), Lemon-Mohler argued that the checks themselves, and not Sharon's testimony about the amounts of the checks, constituted the best evidence of what the McDonalds actually paid.

¶72. Lemon-Mohler further argued that, pursuant to *Gregory*, the responsibility fell on the McDonalds, as the party seeking to prove damages, to offer the best evidence available and, if they had records, to produce those records. Lemon-Mohler stated that it had asked the McDonalds during discovery to produce any documents to support the McDonalds' claim for

33

compensatory damages. However, Lemon-Mohler asserted that the McDonalds failed to produce any documents during discovery to show the amount they paid for the house or to prove the total value of the house.

¶73. In ruling on Lemon-Mohler's objection to Sharon's testimony, the circuit court judge stated the following:

> Okay. The jury is out, and the issue is proof of damages. The question, as I understood it, was very simply, did you go to a closing, were checks written, how much were the checks, and what were they for, basically. I mean, I think that pretty well sums up where we are.
>
> . . . .
>
> Now, looking at it this way, the way that I have thought about it and have looked at it, I think it's very simple and straightforward. Mr. Jalanovich goes and secures an insurance policy on wind, and I don't know if it included flood and water or what. . . . But when he secured that policy, . . . they had a maximum payout on the policy [of $440,000].
>
> . . . .
>
> So, the maximum amount that the insurance company would have paid on that claim, if it's a total loss, was $440,000, the way I see it. It didn't matter if they had a million dollars in the house. The policy was for $440,000. That's all they're going to get. So, the value of the house doesn't really mean a whole lot; it's the value of that policy.
>
> . . . .
>
> Mr. Jalanovich said [the property] is covered. I haven't heard anything from him or anybody else[] saying that, oh, we wanted more insurance than the face value of that policy. Nobody has said that. Nobody has testified to that up to this point.

¶74. The circuit court then sustained Lemon-Mohler's objection. Following the circuit

34

court's ruling, the McDonalds proffered Sharon's testimony that she wrote checks totaling $485,000 and that, between the closing date and the property's destruction, the McDonalds spent another $215,000 to complete the house's construction. Thus, according to Sharon's proffered testimony, the McDonalds invested approximately $700,000 in the project prior to Hurricane Katrina. Sharon further testified during her proffer that the McDonalds planned to sell the property for $1.2 million. Finally, Sharon proffered that, had the McDonalds learned prior to Hurricane Katrina that the property had no wind coverage, they would have obtained around $1 million in insurance for the property.

¶75. Upon review, the record reflects sufficient evidence to support the circuit court's ruling to sustain Lemon-Mohler's objection. As a result, we find no abuse of discretion in the circuit court's ruling limiting the evidence of the McDonalds' compensatory damages to $440,000, which constituted the maximum payout available under MWUA's windstorm policy. *See Lisanby*, 47 So. 3d at 1179 (¶25). Thus, this issue lacks merit.

¶76. **THE JUDGMENT OF THE JACKSON COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, FAIR, JAMES AND WILSON, JJ., CONCUR. MAXWELL, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. ISHEE, J., NOT PARTICIPATING.**